681 So.2d 296 (1996)
Sharon ARCHER, Appellant,
v.
STATE of Florida, Appellee.
No. 95-918.
District Court of Appeal of Florida, First District.
September 4, 1996.
*297 Nancy A. Daniels, Public Defender; David P. Gauldin, Assistant Public Defender, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General; Wendy S. Morris, Assistant Attorney General, Tallahassee, for Appellee.
BENTON, Judge.
Sharon Archer appeals her involuntary placement in Florida State Hospital. She argues that the circuit court erred in denying her motion to dismiss, and in finding that the State had presented clear and convincing evidence demonstrating that she met the criteria for involuntary placement. We reverse on the second ground.
Ms. Archer was originally civilly committed by a court order that is not at issue here. On October 19, 1994, in accordance with section 394.467(4), Florida Statutes (1993), a hearing officer from the Division of Administrative Hearings conducted a hearing on the hospital administrator's request for an order of continued involuntary placement. On November 30, 1994, the hearing officer entered an amended final order denying continued involuntary placement, finding:
The Administrator did not prove, by clear and convincing evidence, that the patient has a mental illness that cannot be treated in an available and appropriate less restrictive setting without serious risk that the patient will harm [her]self, either by self-destructive behavior or by neglect, or will harm others.
The administrator of Florida State Hospital did not appeal the hearing officer's order denying the request for continued involuntary placement or otherwise seek review in accordance with section 120.68, Florida Statutes (1993).
Instead, on January 3, 1995, the hospital administrator filed a new petition for involuntary placement. The petition, quoting section 394.467(1)(a)2.a., Florida Statutes (1993), alleges that Ms. Archer is mentally ill, has refused voluntary placement, is unable to determine whether placement is necessary, and
is manifestly incapable of surviving alone or with the help of willing and responsible family or friends, including available alternative services, and without treatment, [s]he is likely to suffer from neglect or refuse to care for [her]self and such neglect or refusal poses a real and present threat of substantial harm to h[er] well-being.
On January 25, 1995, the day Ms. Archer filed a motion to dismiss the petition for involuntary placement, a hearing was held. On January 26, 1995, the trial court filed the written order for involuntary placement appealed here.

Appeal From Commitment Order Not Moot
The order Ms. Archer is appealing committed her involuntarily for no more than six months, which have since elapsed. § 394.467(4), Fla. Stat. (1993). This passage of time does not, however, moot the appeal. For one thing, an order of involuntary placement may serve as the predicate for continued involuntary placement orders, which can extend an original six months' confinement. "If a circuit judge's order of initial involuntary placement is erroneous, subsequent administrative orders of continued involuntary placement, predicated as they are on the initial order, do not render challenges to that order moot." Everett v. State, 524 So.2d 1091, 1092-93 (Fla. 1st DCA 1988). The record in the present case does not reveal whether Ms. Archer has been released or remains involuntarily committed.
Even if Ms. Archer has been released, moreover, her appeal is not moot, under the cases. "An issue is moot when the controversy has been so fully resolved that a judicial determination can have no actual effect." Godwin v. State, 593 So.2d 211, 212 (Fla.1992)(citing Dehoff v. Imeson, 153 Fla. 553, 15 So.2d 258 (1943)). "[A]n otherwise moot case will not be dismissed if collateral legal consequences that affect the rights of a party flow from the issue to be determined." Id.
In Godwin v. State, 593 So.2d 211 (Fla. 1992), our supreme court held that an appeal from a civil commitment order under chapter 394 did not become moot by virtue of release from confinement, because section *298 402.33(8), Florida Statutes (1993), allowed imposition of a lien for the costs of involuntary commitment, even after discharge.
Godwin's appeal is not moot because section 402.33(8) allows for the imposition of a lien for unpaid fees flowing from an involuntary commitment, and HRS has not indicated a waiver of its right to impose a lien.

Godwin, 593 So.2d at 214. Our supreme court explained at some length why the matter was not moot even when no lien had in fact been filed and despite the appellant's poverty:
The imposition of a lien under section 402.33(8) on the property of an involuntarily committed person is a collateral legal consequence. In all probability, a lien will be filed by the Department of Health and Rehabilitative Services (HRS) long after the expiration of the time for filing an appeal from an order of commitment. In fact, the discretion as to whether and when to file the lien rests solely with HRS. Because section 402.33(8) affects a person involuntarily committed beyond the person's initial release, the statute has collateral legal consequences.

Godwin, 593 So.2d at 213. The court made clear that it was concerned with the legal possibility and not the factual probability of a lien:
The State argues that even if section 402.33(8) does provide a collateral legal consequence, Godwin failed to show that the consequences applied to her case. The State notes that section 402.33(2)(g) reads in part: "[f]ees, other than third-party benefits and benefit payments, may not be charged for services provided to indigents whose only sources of income are from state and federal aid."
Further, section 402.33(1)(g) defines "state and federal aid" as "cash assistance o[r] cash equivalent benefits based on an individual's proof of financial need, including, but not limited to, aid to families with dependent children and food stamps." The statutory exceptions are limited to protecting persons whose sole income is from "[s]tate and federal aid." Even if Godwin does not receive state or federal aid she nevertheless may be indigent, and subject to imposition of a lien in the future despite her indigency. The State further argues that section 402.33(6)(a) keeps HRS from collecting fees against Godwin. Section 402.33(6)(a) provides: "[t]he department may not require a client or responsible party to pay fees it may assess that exceed the client's or responsible party's ability to pay." While section 402.33(6)(a) may restrict HRS's ability to collect fees from Godwin, the statute does not rule out the possibility that HRS may attach a lien to Godwin's property in the future. In this case, HRS has been silent as to whether it will file a lien in the future, and, therefore, Godwin still is subject to the possibility of a collateral legal consequence.

Godwin, 593 So.2d at 213-14.
Ozbourn v. State, 651 So.2d 795, 797-98 (Fla. 1st DCA 1995)(footnote omitted). See Caudle v. State, 478 So.2d 361 (Fla. 1st DCA 1985). The supreme court's decision in Godwin overruled Taylor v. State, 536 So.2d 1050 (Fla. 1st DCA 1988). For the reasons explicated in Godwin and Ozbourn, we turn to the substance of the appeal.

Motion To Dismiss Denied
Section 394.467(1), Florida Statutes (1993), vests circuit courts with authority to grant petitions for initial involuntary placement. See Bentley v. State ex rel. Rogers, 398 So.2d 992 (Fla. 4th DCA 1981). Section 394.467(4)(f), Florida Statutes (1993), requires administrative hearing officers to authorize continued involuntary placement if a person committed by a court continues to meet the criteria. Liebman v. State, 555 So.2d 1242 (Fla. 4th DCA 1989). But "if it is shown at the hearing that the patient does not meet the criteria for involuntary placement, he is entitled to be released," § 394.467(4)(a), Fla. Stat. (1993), once the initial six-month hold expires, absent the initiation of new judicial proceedings.
Before taking evidence on the administrator's petition, the trial court heard *299 argument on appellant's motion to dismiss. In support of the motion, Ms. Archer's counsel argued that the administrator was attempting to circumvent the statutory scheme and vitiate the authority of the Division of Administrative Hearings by filing a new petition for involuntary placement in circuit court based on the same allegations the hearing officer had found not proven and so insufficient to justify continued placement. Like the trial court, we are unwilling to assume, without any evidentiary support, that judicial proceedings were instituted here other than in good faith.
The circuit court denied the motion to dismiss, concluding:
I do not view this proceeding as being an appeal of ... hearing officer Cle[a]v[i]nger's order of ... November 30. I don't have the authority to review that....
There is no way for me to tell whether this is some sort of retaliatory thing. Generally it isn't the Hospital's role or goal in those things. In any event, seeing how people's mental conditions are changeable, the fact that she may have not met the criteria for involuntary hospitalization back at the time this hearing was conducted doesn't necessarily mean that she doesn't now.
I don't know whether she does or not. I'll take the evidence and then try to make that determination. I don't see the fact that she had a prior hearing whether it was with a DOAH officer or with another judge six months ago would necessarily result in a final decision one way or the other.
We have little to add to the learned circuit judge's analysis.
Even though the criteria for continued involuntary placement are identical to the criteria for initial placement, § 394.467(4)(a), Fla. Stat. (1995), and the parties may be viewed as the same in both proceedings, the lapse of time created a different "cause of action." Cf. Gator Shoe Corp. v. Mungia, 510 So.2d 1192 (Fla. 1st DCA 1987). Assuming, without deciding, that an administrative determination may be entitled to res judicata effect in a de novo judicial proceeding in some circumstances, see School Bd. of Seminole County v. Unemployment Appeals Comm'n, 522 So.2d 556 (Fla. 5th DCA 1988), but see Dykes v. Quincy Telephone Co., 539 So.2d 503 (Fla. 1st DCA 1989), no reason has been demonstrated for doing so here. See generally Thomson v. Department of Environmental Regulation, 511 So.2d 989 (Fla. 1987). On appeal, no question as to the legality of appellant's detention at any time prior to January 26, 1995, has been presented. More than three months separated the hearing before the hearing officer on the hospital administrator's request for order of continued involuntary placement and the hearing in circuit court on the hospital administrator's petition for "initial" placement.

Criteria For Involuntary Placement Not Proven
Proof that the criteria for involuntary placement have been met must be clear and convincing. In re Beverly, 342 So.2d 481 (Fla.1977); Jones v. State, 611 So.2d 577 (Fla. 1st DCA 1992); Braden v. State, 575 So.2d 756 (Fla. 1st DCA 1991); Welk v. State, 542 So.2d 1343 (Fla. 1st DCA 1989); Williams v. State, 522 So.2d 983 (Fla. 1st DCA 1988); Smith v. State, 508 So.2d 1292 (Fla. 1st DCA 1987); Neff v. State, 356 So.2d 901 (Fla. 1st DCA 1978). Section 394.467(1), Florida Statutes (1993), specifies the criteria on which involuntary placement decisions must depend:
(1) CRITERIA.A person may be involuntarily placed for treatment upon a finding of the court by clear and convincing evidence that:
(a) He is mentally ill and because of his mental illness:
1.a. He has refused voluntary placement for treatment after sufficient and conscientious explanation and disclosure of the purpose of placement for treatment; or
b. He is unable to determine for himself whether placement is necessary; and
2.a. He is manifestly incapable of surviving alone or with the help of willing and responsible family or friends, including available alternative services, and, without treatment, he is likely to suffer from neglect *300 or refuse to care for himself, and such neglect or refusal poses a real and present threat of substantial harm to his well-being; or
b. There is substantial likelihood that in the near future he will inflict serious bodily harm on himself or another person, as evidenced by recent behavior causing, attempting, or threatening such harm; and
(b) All available less restrictive treatment alternatives which would offer an opportunity for improvement of his condition have been judged to be inappropriate.
The evidence presented below did not clearly and convincingly show that Ms. Archer was "incapable of surviving alone," or that she was "likely to suffer from neglect or refuse to care for h[er]self, and [that] such neglect or refusal pose[d] a real and present threat of substantial harm to h[er] well-being." § 394.467(1)(a)2.a., Fla. Stat. (1993).
Carolyn Buby, a psychologist, testified that Ms. Archer has a mental illness of long standing. Dr. Buby testified that, among Ms. Archer's delusions, is her belief that she is the Virgin Mary. Dr. Buby also characterized as a delusion Ms. Archer's belief that her medication is giving her a rash. Dr. Buby concluded:
My position is that because of her persistent denial of the need for medication and of her incompetence to consent for treatment at the present time she is not capable of discharge.... She would be a danger to herself in any kind of independent placement at the present time because of this bizarre behavior. The bizarre behavior would occur because she would stop taking her medication.
On cross-examination, Dr. Buby conceded that Ms. Archer had not threatened to hurt herself in any fashion, and that she had not threatened to hurt anyone else. According to Dr. Buby, when Ms. Archer takes her medication, she is able to meet her basic needs; she dresses herself, feeds herself, and cleans her living area. Cf. Bergman v. Serns, 443 So.2d 130 (Fla. 3d DCA 1983), review dismissed, 450 So.2d 488 (Fla.1984). Dr. Buby's primary concern was that, if discharged, Ms. Archer would stop taking her medicine: "I have not seen Sharon off medication for a substantial length of time. I cannot project what she would do."
Wayne Basford, the attorney appointed to represent Ms. Archer in her guardianship proceeding, testified that Ms. Archer's mother and a sister were removed as guardians because they had rescinded authorization for Ms. Archer to receive psychotropic medication, knowing it would result in her deterioration. At their request (before their removal as guardians), Ms. Archer's medication was discontinued on November 20, 1995. Dr. Buby testified that on November 29, 1995, Ms. Archer had been talking to the Holy Spirit, trying to feed potato chips to other residents, and trying to bless them. By December 1, 1995, Ms. Archer had resumed taking psychotropic drugs prescribed to prevent bizarre behavior and hallucinations.
Ms. Archer testified that she would continue to take her medication, if discharged.
Q. Now, if this Judge were to say if you take your medication we're going to let you go, would you take your medication?
A. Yes.
On cross-examination Ms. Archer reiterated her intention to take medication, if instructed to do so.
Q. If you're discharged and the doctors at the mental health center say that's what you've got to take, what would be your opinion?
A. Well, I'm supposed to take the medication. I have said that I would take the medication, but like I said, I believe that that could be negotiated with the doctor.
Q. What do you mean by the term "negotiated"?
A. I believe that a patient that exhibits manic depressionyou've probably seen the depression that I've had todayshould be allowed to be on a good medication, not something that would be destroying them....
Q. The idea being that if you were released and were told to take one of those psychotropic medications and you didn't like it then I gather from what you're saying then you don't plan on taking it.

*301 A. Actually I didn't say that, sir, but that's a hypothetical situation I had mentioned earlier and the last time I was discharged from the hospital that didn't happen. I was discharged off the medication.
Q. I'm asking you what your intentions are.
A. I already said that I intend to take the medication.
Despite her clear testimony that she would continue to take her medication if discharged, the trial court granted the petition for involuntary placement, stating:
THE COURT: I am worried about your ability to remain free from being harmful to yourself primarily by not taking the medication. The history that I would glean from this
THE WITNESS: I said that I would take the medication.
The assertion in the petition for involuntary placement that Ms. Archer was incapable of surviving alone and would suffer from neglect or refuse to care for herself if released was supported at the hearing solely by Dr. Buby's testimony set out in pertinent part above.
On this record, Dr. Buby's testimony does not meet the requirement of clear and convincing proof that discharge would pose a "real and present threat of substantial harm," particularly since Ms. Archer testified that she would take medication she was told she had to take, and Dr. Buby conceded that, when Ms. Archer is on psychotropic medication, she can take care of her basic needs. A "non-dangerous individual, capable of surviving safely in freedom by herself or with the help of others, should never be involuntarily committed." Williams v. State, 522 So.2d 983, 984 (Fla. 1st DCA 1988); In re Beverly; In re Smith, 342 So.2d 491 (Fla. 1977); Ozbourn; Neff.
The order granting the petition for involuntary placement is reversed.
VAN NORTWICK, J., concurs.
WOLF, J., dissents with opinion.
WOLF, Judge, dissenting.
I respectfully dissent. The trial court was not required to believe appellant's testimony that she would continue to take her medication. There was sufficient evidence to support the trial court's determination of involuntary placement.