In re the Commitment of Kenneth Parrish:

State of Wisconsin, Petitioner-Respondent,

v.

Kenneth Parrish, Respondent-Appellant.†

Court of Appeals

*No. 00–2524. Submitted on briefs August 26, 2002.—Decided October 15, 2002.*

2002 WI App 263

(Also reported in 654 N.W.2d 273.)

† Petition to review denied 1-21-03.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Charles Bennett Vetzner*, assistant state public defender.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Diane M. Welsh*, assistant attorney general.

Before Fine, Schudson and Curley, JJ.

¶ 1. SCHUDSON, J. Kenneth Parrish appeals from the trial court judgment and order committing him to the Wisconsin Department of Health and Family Services, following a bench trial in which the court found that he was a sexually violent person under ch. 980. He also appeals from the trial court order denying

his motion for post-commitment relief. Parrish argues that the trial court erred in: (1) concluding that neither claim preclusion nor issue preclusion barred the State from seeking his ch. 980 commitment following his parole revocation, even though the State had failed to prove that he was a sexually violent person in need of commitment in a previous ch. 980 trial that took place prior to his parole; and (2) failing to examine the record of the earlier, pre-parole commitment trial in order to determine whether issue preclusion barred the post-parole-revocation commitment trial.

¶ 2. Parrish also argues that his commitment is improper because: (1) the evidence did not establish that he suffered from a mental disorder that rendered him unable to control his sexually violent behavior and, further, that absent such evidence of a condition affecting "volitional" capacity, *see* Wis. Stat. § 980.01(2), a person cannot be committed under ch. 980; (2) defense counsel "prejudiced the chances for prevailing at trial by failing to seek assistance from an expert to counter the key opinion testimony of the government expert witness"; and (3) the 1999 amendments to ch. 980 violate his rights to due process and equal protection.

¶ 3. We conclude that, under the doctrines of claim preclusion and issue preclusion, because a ch. 980 commitment trial necessarily focuses on the current circumstances of a defendant, a post-parole-revocation commitment trial is not barred by the fact that a pre-parole commitment petition was tried and dismissed. We also conclude that although evidence introduced at a pre-parole commitment trial may be relevant to a post-parole-revocation trial, and although a court may consider the record of a pre-parole commitment trial in order to determine the merits of a motion, based on issue preclusion, to dismiss a post-parole-revocation

commitment petition, the trial court is not, as a matter of law, required to examine the record of the pre-parole trial in order to decide the motion. We also reject Parrish's other challenges to his commitment and, therefore, affirm.

## I. BACKGROUND

¶ 4. As summarized by Dr. Timothy J. McGuire, a Wisconsin Department of Corrections psychologist, in his 1998 "Chapter 980 Sexual Predator Evaluation" report, Parrish "presents a long standing history of sexually assaultive behavior, with increasing violence, beginning as a juvenile and continuing unabated into adulthood." Parrish's record of sexual assaults of teenage girls culminated in 1985 when he was convicted of first-degree sexual assault and endangering safety by conduct regardless of life, and sentenced to consecutive prison terms totaling twenty-three and one-half years.

¶ 5. In 1995, as Parrish was approaching his mandatory release date and parole, the State petitioned for his commitment under ch. 980. Thus, Parrish was not paroled; instead, he was held in custody pending his ch. 980 trial, which did not take place until May 28 – June 10, 1997. At that trial, however, the court found that the evidence had not proven that Parrish was a sexually violent person in need of commitment and, therefore, it dismissed the petition. Consequently, on June 13, 1997, Parrish was released on parole.

¶ 6. Within a few months of his release, Parrish's parole was revoked as a result of an incident in which he threatened a co-worker with a knife. Thus, he was returned to prison in September 1997 and, in 2000, when Parrish was within 90 days of release, the State again petitioned for his ch. 980 commitment. Parrish

moved to dismiss the petition asserting that the 1997 dismissal of the 1995 commitment petition barred the State's 2000 commitment petition. Relying on what he termed "the concepts of *res judicata,* issue preclusion, collateral estoppel, estoppel by the record, and double jeopardy," Parrish requested dismissal "on the grounds that the same issues have been, and are being, presented in the two petitions." He maintained:

> The present litigation has precisely the same parties, issues, claims, and theories which were a part of and asserted during the previous action. Nothing has changed in any material respect . . . . The trial court in 1997[] considered those same claims and propositions, and found them to be insufficient to sustain the requirements of the law so as to justify commitment . . . . Now, thirteen months later, the [S]tate must not be allowed a "second kick at the cat[.]"

¶ 7. In response to the motion, the State challenged Parrish's factual premise that "[n]othing ha[d] changed in any material respect." The State maintained:

> [Parrish] was tried before the court in 1997, and the court found that based on facts existing up to the time of the trial, the State had not met its burden of proof. Since that time, [Parrish] was released on parole and revoked, sent back to prison and reached a new discharge date. Thus, the facts accounting for his parole revocation—which are not yet before the court—are new to the formula. Revocations occur because a criminal offender either violates the law, violates his rules of parole, or significantly fails to abide by certain parole requirements. Any or all of these occurrences would clearly affect the formulation of a risk assessment of the Respondent's future dangerousness, and therefor[e] are new facts to the second Chapter 980 prosecu-

527

tion. They may also materially affect the strength of the mental disorder diagnosis, another element the State must prove anew.

¶ 8. The trial court embraced the State's argument. Denying Parrish's motion to dismiss, the court commented that the facts and circumstances that had "come to light since the prior proceeding" were important and, in particular, Parrish's parole revocation and subsequent incarceration "create[d] a whole new dynamic to his risk assessment which may affect the strength of [his] mental disorder diagnosis."[1]

¶ 9. At the second ch. 980 trial, the State presented extensive testimony from Dr. Dennis M. Doren, a psychologist employed at the Mendota Mental Health Institute, and from Christopher Kittman, a Wisconsin Department of Corrections probation and parole agent. Parrish called no witnesses. Concluding that the evidence established that Parrish was a sexually violent person, the trial court commented on his conduct following parole:

> He wasn't actually released from an institution until June 13th of '97. Then again, three months later, September of 1997[,] he's got his parole revoked for threatening co-workers [sic] with a knife.
>
> In that very limited time that he has been outside of institutions, he's engaged in some violent conduct, conduct that certainly shows a disregard for other people, conduct that shows in particular a disregard for

---

[1] The circuit court memorandum decision and order denying Parrish's motion to dismiss were rendered by Judge Jeffrey A. Wagner on March 10, 1999. This court denied Parrish's petition for leave to appeal Judge Wagner's order on June 22, 1999. Subsequent proceedings at issue in this appeal were before Judge Daniel L. Konkol.

females, and conduct that . . . involved sexual misconduct and . . . is [of] a criminal nature with regard to females.

¶ 10. In his motion for post-commitment relief, Parrish maintained that "[t]he circumstances pertaining to the parole release and revocation were not relevant to the diagnosis of [his] purported mental disorder in the instant proceeding and did not have any significant influence in raising the risk factor while assessing [his] dangerousness for the purposes of a ch. 980 commitment." Thus, Parrish contended that, because no new material factual circumstances had arisen since the first trial, both claim preclusion and issue preclusion should have barred his second ch. 980 trial.

¶ 11. In his post-commitment motion, Parrish also contended that: (1) the evidence was insufficient because it did not include what he termed "the constitutionally required evidence of a volitional impairment"; (2) defense counsel was ineffective for failing to "consult with, retain or seek appointment of a mental health professional" to counter Dr. Doren's testimony; and (3) the amendments to ch. 980, removing the obligation of a committing court to employ the least restrictive dispositional alternative and requiring a committed defendant to remain at the Wisconsin Resource Center for at least eighteen months before petitioning for supervised release, *see* WIS. STAT. §§ 980.06, 980.065, 980.08, denied him due process "by transposing the commitment into punishment," inconsistent with "the original treatment rationale" of ch. 980.

¶ 12. In its written decision rejecting Parrish's preclusion argument and denying his post-commitment motion, the trial court declared:

529

[Parrish] would have this court accept that the revocation is insignificant to his risk to reoffend because it did not involve a sexually assaultive offense and because it does not specifically relate to his mental disorder diagnosis. The question, however, is not whether the revocation proved [Parrish] to be a sexually violent person but whether that event and the circumstances surrounding it, which were not before the court in the prior proceedings, altered an assessment of his risk to reoffend within the community.

The court also concluded that "[e]vidence of volitional impairment was not required," that counsel's failure to secure an expert to counter Dr. Doren's testimony was not prejudicial, and that the amendments to ch. 980 did not deny Parrish equal protection or due process.

## II. DISCUSSION

### A. Claim Preclusion and Issue Preclusion

¶ 13. Parrish first argues that the second ch. 980 trial should have been barred by the doctrine of claim preclusion or, in the alternative, issue preclusion.[2] We disagree.

¶ 14. Under the doctrine of claim preclusion, a final judgment is conclusive in all subsequent actions between the same parties or their privies involving all

---

[2] Parrish also observes that "[w]here the litigation concerns the efforts of the government to deprive an individual of his liberty, the preclusion doctrines are within the scope of a person's constitutional guarantee against being subjected to double jeopardy." *See State v. Canon*, 2001 WI 11, ¶¶ 8–22, 241 Wis. 2d 164, 622 N.W.2d 270. On appeal, however, Parrish does not present a separate double-jeopardy argument.

matters litigated, and all matters that could have been litigated, in the proceeding leading to the judgment. *Northern States Power Co. v. Bugher*, 189 Wis. 2d 541, 550, 525 N.W.2d 723 (1995). Under the doctrine of issue preclusion, a final judgment bars the relitigation of a factual or legal issue that actually was litigated and decided in the earlier action. *Id.* Whether either preclusion doctrine applies to bar an action is a legal issue we review *de novo. Mayonia M.M. v. Keith N.*, 202 Wis. 2d 460, 464, 551 N.W.2d 31 (Ct. App. 1996).

¶ 15. To determine whether claim preclusion bars an action, a court considers whether: (1) both the prior action and the challenged action have the same parties; (2) both the prior action and the challenged action have the same causes of action; and (3) the prior action resulted in a final judgment on the merits in a court of competent jurisdiction. *See Northern States Power*, 189 Wis. 2d at 551. Here, the parties agree, only the second criterion is at issue. And because that second criterion of claim preclusion is inextricably connected to issue-preclusion analysis—whether a specific issue already has been litigated, *see id.* at 550—our determination, in the instant appeal, of whether the same cause of action was involved in both Parrish's pre- and post-revocation commitment trials will resolve his appellate claims under both preclusion doctrines.

¶ 16. Parrish concedes that his parole revocation "did constitute a new factual development." He argues, however, that "it does not follow that every factual change of some marginal relevance between the initiation of the two proceedings authorizes a second suit." After all, he maintains, if any factual change allowed for the State's renewal of its effort to commit a person

under ch. 980, "the [S]tate would almost always be able to initiate a second ch. 980 proceeding if it lost the first case."

¶ 17. Parrish argues, therefore, that *significant* or *substantial* new facts resulting in a *material* change in circumstances are necessary before the State may bring a second ch. 980 petition. *See Juneau Square Corp. v. First Wis. Nat'l Bank of Milwaukee*, 122 Wis. 2d 673, 687, 364 N.W.2d 164 (Ct. App. 1985). He contends that no such facts were present here and no material change in circumstances occurred between his two trials. His brief to this court elaborates:

> While [Dr.] Doren . . . changed his diagnosis of Parrish from the first trial, he did not claim that the circumstances of the revocation had any bearing whatsoever on his altered opinion. To the contrary, [Dr.] Doren expressly based his opinions on six specific acts committed by Parrish, the most recent occurring in 1990.
>
> . . . .
>
> It is not surprising that [Dr.] Doren could not point to Parrish's threats resulting in revocation as raising the degree of risk. Parrish's "verbally violent" behavior, as [Dr.] Doren called it, hardly makes him a model citizen, but it does nothing to demonstrate that he is likely to engage in future acts of "sexual violence[.]" . . . To the contrary, it could readily be contended that Parrish's abstinence from sexually improper behavior during his period of release made him a less likely candidate for a ch. 980 commitment than he was at the first trial when the [S]tate's evidence was inadequate.

¶ 18. The State first responds by countering Parrish's concern that almost any factual change could allow the State to pursue a second ch. 980 petition simply "if it lost the first case." As the State explains, WIS. STAT. § 980.02 does not provide for such an easy

return to court. A second petition could only be filed for a defendant who, once again, was in custody and, once again, was within ninety days of release or discharge. Thus, at the very least, any change in circumstances leading to the second petition would have had to have been significant enough to have warranted the defendant's return to custody.

¶ 19. The State is correct. WISCONSIN STAT. § 980.02(2)(ag) requires that a ch. 980 petition allege that the subject is "within 90 days of discharge or release, on parole . . . or otherwise, from a sentence that was imposed for a conviction for a sexually violent offense." Thus, the State certainly would not "almost always be able to initiate a second ch. 980 proceeding if it lost the first case" as Parrish claims; the statute blocks the parade Parrish predicts.[3]

¶ 20. The State next responds by emphasizing that in Parrish's pre-parole commitment trial, "all that was litigated was whether Parrish was a sexually violent person in need of commitment *at that time*." While that temporal limitation is obvious, it also is important. In fact, just recently, this court accentuated the singular significance of the present-time focus of a ch. 980 commitment trial. In *State v. Treadway*, 2002 WI App 195, 257 Wis. 2d 467, 651 N.W.2d 334, *review denied,* 2002 WI 121, 257 Wis. 2d 116, 653 N.W.2d 889 (Wis. Oct. 21) (No. 00–2957), we considered whether a ch. 980 petition must be filed within ninety days of a

---

[3] We note, in this regard, that Parrish makes no claim that his revocation was a mere ruse used by the State to regain the opportunity to petition for his commitment. Needless to say, our courts would be sensitive to any governmental attempt to circumvent ch. 980's limitations by manufacturing an insubstantial parole revocation in order to gain a second chance to seek commitment.

defendant's release from his aggregate sentence, or within ninety days of his completion of his sentence for a sexually violent offense where he also was serving consecutive time for non-sexually-violent offenses. *Id.* at ¶¶ 12–18. We rejected what we deemed the absurd construction of WIS. STAT. § 980.02(2)(ag), which would have required that the petition be filed within ninety days of his completion of the sentence for the sexually violent offense, notwithstanding the fact that release was many years away. We explained:

> After all, if the State were required to file its WIS. STAT. ch. 980 petition within ninety days of the conclusion of a sentence for a sexually violent offense, despite the fact that the subject of the petition still could be serving additional time in an unbroken string of sentences, the petition could not accurately address *the defendant's circumstances, mental condition, and treatment needs at the time of scheduled release.* Discharge or release could be many months or, as in this case, many years away.
>
> Moreover, in some cases, concurrent sentences, or concurrent and consecutive sentences, interlace, and some are *further complicated by sentences after revocation.*

*Id.* at ¶¶ 17–18 (emphases added). *See also State v. Laxton*, 2002 WI 82, ¶ 18 n.12, 254 Wis. 2d 185, 647 N.W.2d 784 ("Wisconsin ch. 980 focuses on [a defendant's] *present* mental disorder . . . . [D]angerous individuals are subject to civil commitment under ch. 980 because of a *present* mental disorder involving serious difficulty controlling [their] behavior." (emphasis added)).

¶ 21. Here, Parrish's second ch. 980 trial differed from his first not simply because it involved a different release date, but also because it came years after the

first trial, thus requiring the court to consider new facts and circumstances. While Parrish maintains that those facts following the first trial were of little if any significance, he concedes their relevance. And as the State cogently argues, the "dynamic nature of both a person's mental health and his or her need for commitment" suggests that the passage of time, together with important factual developments—conduct leading to parole revocation, a return to custody, and subsequent conduct and treatment while incarcerated—may indeed justify a new ch. 980 petition.[4]

¶ 22. Although Parrish's preclusion argument presents an issue of first impression in Wisconsin, other jurisdictions have considered the dynamic nature of mental health and the importance of present-time determinations in the contexts of their civil commitment laws. *See In re Mental Health L.C.B.*, 830 P.2d 1299, 1304 (Mont. 1992); *Archer v. State*, 681 So. 2d 296, 299 (Fla. Dist. Ct. App. 1996); *In re Katz*, 638 A.2d 684, 687 (D.C. 1994). Recently, the California Court of Appeals explained why the State's petition for extension of a defendant's commitment under the Sexually Violent Person Act (SVPA), California's counterpart to ch. 980,[5] must be based on the defendant's current condition, with particular concentration on the developments since the last commitment order:

---

[4] In this case, Parrish's conduct leading to parole revocation was particularly significant. Parrish not only threatened a co-worker, but did so with a knife. Parrish also had used a knife in two separate crimes resulting in convictions for first-degree sexual assault; in one of them he slashed the victim's face.

[5] Under the SVPA, a commitment continues for only two years unless extended by court order. *See Butler v. Superior Court*, 93 Cal. Rptr. 2d 468, 473–74 (Ct. App. 2000) (quoting CAL. WELF. & INST. CODE § 6604 (1995)).

> The nature of the [SVPA] envisions a special civil commitment proceeding that is begun and then continues, changes or ends depending upon the *current* mental condition and dangerousness of the proposed or committed [sexually violent person] . . . . Although the same requirements or issues are involved in alleging any "cause" filed via petition under the Act, the actual facts or circumstances comprising that "cause" in a subsequent petition will necessarily be different due to the addition of new facts bearing on those issues based on the sheer passage of time which may support the release or commitment of the proposed [sexually violent person].

*Butler v. Superior Court*, 93 Cal. Rptr. 2d 468, 474 (Ct. App. 2000) (citations omitted). While the court was not considering whether claim or issue preclusion barred the State's action, its emphasis on "the *current* mental condition and dangerousness," "the addition of new facts," and "the sheer passage of time" is sound and applicable here. In fact, such emphasis is all the more meaningful where a defendant is released, revoked, and returned to custody during that "sheer passage of time."

¶ 23. In Parrish's cases, more than a year passed between the time a trial court determined that the evidence had not established that he was a sexually violent person and the time the State filed the second ch. 980 petition. In the interim, Parrish's parole was revoked and he was returned to prison. The passage of time, the new circumstances, and the dynamic nature of his mental health and potential dangerousness allowed the State to file a new petition for his commitment. Neither claim preclusion nor issue preclusion barred Parrish's post-parole-revocation commitment trial.

## B. Issue Preclusion / Record of the Prior Ch. 980 Trial

██

¶ 24. Parrish also argues, however, that before resolving the matter of issue preclusion, the trial court was obligated to examine the record of the first ch. 980 trial. He contends, therefore, that the trial court erred in denying his repeated requests to review that record, and he further argues that because this court has denied his two motions to supplement the appellate record with the transcript of the first trial, he is being denied "a fair appeal" of his challenge to the trial court's ruling on issue preclusion.[6] Parrish is incorrect.

¶ 25. Under certain circumstances, a trial court might need to review the record of a previous ch. 980 trial and, no doubt, consider an offer of proof from a defendant challenging a petition on the basis of issue preclusion. For example, where a second petition is filed on the heels of a trial resulting in the dismissal of the first petition and where, a defendant alleges, a parole revocation was nothing more than a ruse to re-incarcerate and regain a chance for ch. 980 commit-ment, a careful court might want to review the first trial's record. Here, however, the trial court was not required to do so because the issue, quite obviously, had changed.

¶ 26. The issue, when the second petition was filed, was whether Parrish was a sexually violent person

---

[6] Denying the second of Parrish's two motions to supple-ment the record, this court stated: "Parrish has not shown that it would be necessary for this court to review the transcripts from [his first ch. 980 trial] in order to review the trial court's order. The trial court's decision was apparently based on the changing picture of Parrish's dangerousness since the last trial."

in need of commitment in 2000, following release and revocation, not in 1997, prior to parole. The trial court did not need to read the record of the first trial to understand that. The trial court did not need to know the details of the first trial in order to determine that issue preclusion did not bar the second petition.[7]

## C. Volitional Capacity

■

¶ 27. Parrish next argues that the evidence did not establish that he suffered from a mental disorder that rendered him unable to control his sexually violent behavior and, further, that absent such evidence of "a congenital or acquired condition affecting . . . *volitional* capacity," *see* WIS. STAT. § 980.01(2) (emphasis added), a person may not be committed under ch. 980. He points to a portion of the trial court's written decision denying post-commitment relief, in which the court: (1) commented on the State's evidence establishing that he had two mental disorders that "affected his emotional *or* volitional capacity"; and (2) concluded that "[e]vidence of volitional impairment was not required at trial." (Emphasis added; citation omitted.)

---

[7] Parrish relies on *State v. Vassos*, 218 Wis. 2d 330, 579 N.W.2d 35 (1998), in which the supreme court concluded that a trial court, determining whether issue preclusion barred a defendant's prosecution for misdemeanor battery following his acquittal for felony battery, must examine the record of the felony trial. *See id.* at 344–45. As the State points out, however, *Vassos*, dealing with whether a criminal prosecution is foreclosed because the defendant already has been acquitted of the crime, is not analogous to Parrish's case, dealing with whether a ch. 980 civil commitment trial is foreclosed despite the passage of time and the development of facts and circumstances never considered in the prior trial.

¶ 28. Parrish argues that such evidence is required. He first notes that the State must prove beyond a reasonable doubt that a defendant "has a mental disorder." *See* WIS. STAT. §§ 980.02(2)(b) and 980.05(3)(a). He then contends that because "mental disorder" is defined as "a congenital or acquired condition affecting the emotional *or* volitional capacity that predisposes a person to engage in acts of sexual violence," *see* WIS. STAT. § 980.01(2) (emphasis added), ch. 980 has created "two distinct categories of conditions—those that affect the emotional capacity and those that affect volitional capacity." Parrish maintains, therefore, that "proof of the latter category is essential for the commitment to be constitutionally valid" and that, in his trial, the evidence failed to establish the requisite condition affecting his "volitional capacity."

¶ 29. In his brief to this court, Parrish relied on the United States Supreme Court's decision in *Kansas v. Hendricks*, 521 U.S. 346 (1997), upholding Kansas' sexual-predator-commitment law, which required proof of a "mental abnormality" and which, like WIS. STAT. § 980.01(2)'s definition of "mental illness," defined such an abnormality, in part, as a "condition affecting the emotional *or* volitional capacity." *See Hendricks*, 521 U.S. at 352 (emphasis added). Parrish emphasizes that, notwithstanding these apparent definitional alternatives, *Hendricks* included language that could be read to limit commitment to those "who suffer from a volitional impairment rendering them dangerous beyond their control." *Id.* at 358. Thus, Parrish maintains that, in his case, the lack of evidence of volitional incapacity, and the trial court's conclusion that "[e]vidence of volitional impairment was not required at trial" provide the basis for vacating his commitment.

¶ 30. Subsequent to the briefing in Parrish's appeal, the United States Supreme Court decided *Kansas v. Crane*, 534 U.S. 407 (2002), further developing the *Hendricks* analysis, and the Wisconsin Supreme Court decided *Laxton*, applying *Crane* to ch. 980. Both *Crane* and *Laxton* guide our discussion and, here, we highlight those aspects of each decision that most directly determine the fate of Parrish's theory.

¶ 31. In *Crane*, the Supreme Court demarcated certain boundaries of its decisions—in both *Hendricks* and *Crane*. The Court clarified that *Hendricks* "set forth no requirement of *total* or *complete* lack of control" as a constitutional prerequisite to commitment. *Crane*, 534 U.S. at 411. As the Court also clarified, however, "*Hendricks* had no occasion to consider whether confinement based solely on 'emotional' abnormality would be constitutional, and we likewise have no occasion to do so in the present case." *Id.* at 415. Thus, explicitly, *Crane* did not directly address the theory Parrish now posits.

¶ 32. In *Crane*, however, the Supreme Court set out certain parameters that seem to apply to Parrish's position. On the one hand, the Court rejected, as a prerequisite to commitment, an "[i]nsistence upon absolute lack of control" because such a requirement "would risk barring the civil commitment of highly dangerous persons suffering severe mental abnormalities." *Id.* at 412. On the other hand, the Court also rejected the proposition "that the Constitution permits commitment of the type of dangerous sexual offender considered in *Hendricks* without *any* lack-of-control determination." *Id.*

¶ 33. The Court resisted any hard-and-fast formula for determining an issue of volitional capacity:

> And we recognize that in cases where lack of control is
> at issue, "inability to control behavior" will not be

540

> demonstrable with mathematical precision. *It is enough to say that there must be proof of serious difficulty in controlling behavior.* And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment[,] from the dangerous but typical recidivist convicted in an ordinary criminal case.

*Id.* at 413 (emphasis added). And finally, and of particular pertinence to the precise argument Parrish presents, the Court explained that, in *Hendricks*, it "did not draw a clear distinction between the purely 'emotional' sexually related mental abnormality and the 'volitional.' " *Id.* at 415. The Court then declared, "Here, as in other areas of psychiatry, there may be 'considerable overlap between a . . . defective understanding or appreciation and . . . [an] ability to control . . . behavior.' " *Id.* (citation omitted; ellipses and alteration in *Crane*).

¶ 34. In *Laxton*, the Wisconsin Supreme Court considered whether ch. 980 was constitutional even though "the provisions of the chapter do not require a [determination] that the person has a mental disorder that involves *serious difficulty in controlling his or her behavior.*" *See Laxton*, 2002 WI 82 at ¶ 1 (emphasis added); *see also Crane*, 534 U.S. at 411. Based on several of its recent decisions on ch. 980 challenges, and "particularly" based on *Crane*, the supreme court concluded:

> [S]uch a civil commitment does not require a separate finding that the individual's mental disorder involves serious difficulty for such person to control his or her behavior. The requisite proof of lack of control is established when the nexus between such person's mental disorder and dangerousness has been estab-

lished. Specifically, ... evidence showing that the person's mental disorder predisposes such individual to engage in acts of sexual violence, and evidence establishing a substantial probability that such person will again commit such acts, necessarily and implicitly includes proof that such person's mental disorder involves serious difficulty in controlling his or her behavior.

*Laxton*, 2002 WI 82 at ¶ 2. The supreme court went on to explain, adopting the state's argument, "that the concept of control is necessarily encompassed by the statutory criteria of a mental disorder and dangerousness." *Id.* at ¶ 20. Thus, the court concluded that "the required proof of lack of control ... may be established by evidence of the individual's mental disorder and requisite level of dangerousness, which together distinguish a dangerous sexual offender who has serious difficulty controlling his or her behavior from a dangerous but typical recidivist." *Id.* at ¶ 21 (footnote omitted). "Proof of this nexus [between the mental disorder and the individual's dangerousness] necessarily and implicitly involves proof that the person's mental disorder involves serious difficulty for the person to control his or her behavior." *Id.* at ¶ 22; *see also id.* at ¶ 23. With these standards now firmly set in place, the sufficiency of the evidence in Parrish's trial becomes clear.

¶ 35. Parrish does not dispute the evidence of his mental illness; and while deeming it insufficient, Parrish does not dispute the evidence of his dangerousness. He contends, however, that the trial court failed to find the necessary nexus and, further, that it erred in concluding that "[e]vidence of volitional impairment was not required at trial." Now, however, on the strength of *Laxton*, we conclude that although the trial

542

court, in its post-commitment analysis, erred in commenting that "[e]vidence of volitional impairment was not required," it found such evidence that did indeed establish the nexus establishing Parrish's "serious difficulty in controlling [his] behavior." *See Crane,* 534 U.S. at 412.

¶ 36. In its written decision denying post-commitment relief, the trial court, immediately after identifying the testimony of Dr. Doren that established Parrish's two mental disorders, commented that the disorders "affected [Parrish's] emotional or volitional capacity" and "predispose[d him] to engage in acts of sexual violence." The court then declared:

> Dr. Doren further testified in regard to [Parrish's] dangerousness that *each of these disorders gave rise to a substantial probability that [Parrish] would commit a sexually violent act in the future. Based upon this testimony and evidence of [Parrish's] extensive record, including various sexually related offenses, the court found that the State had met its burden of proof of showing beyond a reasonable doubt that [Parrish] suffered from a mental disorder which made him a danger to others because it created a substantial probability that he would engage in acts of sexual violence.*

(Emphasis added; citations omitted.) Clearly, therefore, while disclaiming the need for evidence of volitional impairment, the trial court found such evidence. Just as clearly, that evidence convinced the trial court of Parrish's "serious difficulty in controlling [his] behavior." *Id.* at 412.

## D. Assistance of Counsel

¶ 37. Parrish next argues that defense counsel "prejudiced the chances for prevailing at trial by failing

to seek assistance from an expert to counter the key opinion testimony" of Dr. Doren. Parrish contends that the trial court, in denying his post-commitment motion, erred in: (1) concluding that he had failed to establish prejudice; and (2) denying an evidentiary hearing, instead basing its decision on its assessment of the report from Dr. Lynn Maskel, which he (Parrish) submitted in support of the post-commitment motion. We are not persuaded.

¶ 38. The standards controlling claims of ineffective assistance of counsel have been repeated in countless cases and need not be elaborated here. *See Strickland v. Washington*, 466 U.S. 668 (1984). Suffice it to say that in order to prevail, a defendant must establish both that counsel's performance was deficient and that the deficient performance produced prejudice. *See id.* at 687; *State v. Sanchez*, 201 Wis. 2d 219, 236, 548 N.W.2d 69 (1996). This court need not determine whether counsel's performance was deficient if the defendant has failed to show prejudice. *State v. Matek*, 223 Wis. 2d 611, 616, 589 N.W.2d 441 (Ct. App. 1998). Issues of whether counsel's performance was deficient or prejudicial are legal ones, subject to our independent review. *Sanchez*, 201 Wis. 2d at 236–37.

¶ 39. Denying Parrish's post-commitment motion, the trial court concluded that Dr. Maskel's information would not have made any difference; it would not have altered its commitment decision and, therefore, that Parrish had failed to establish prejudice. The court explained, in relevant part:

> Dr. Maskel's report purports to challenge Dr. Doren's ability to translate his medical diagnoses of [Parrish] into legal standards of Chapter 980 as well as his failure

544

to testify as to [Parrish's] volitional impairment. Dr. Maskel gives several of her own opinions about the types of instruments used by Dr. Doren in determining [Parrish's] risk to reoffend. None of these factors, however, undermines confidence in the outcome of the trial. Dr. Doren testified that his diagnosis that [Parrish] suffered from a medical [sic] disorder was based upon a medical opinion as an evaluator and not a legal opinion under Chapter 980. Dr. Doren was not qualified to nor obligated to testify whether his diagnosis of [Parrish] fulfilled the standards of Chapter 980—a legal determination . . . . Trial counsel thoroughly cross-examined Dr. Doren's findings and conclusions . . . . Moreover, the court had the opportunity to hear all the testimony and to review all of the evidence, and based upon the same, the court finds that expert testimony from Dr. Maskel would not have altered a finding that [Parrish] is a sexually violent person under Chapter 980.

(Citations omitted.) Parrish offers nothing substantial to counter the trial court's characterization of Dr. Maskel's report or its comparative value in determining the weight of Dr. Doren's testimony. *See Barakat v. DHSS*, 191 Wis. 2d 769, 786, 530 N.W.2d 392 (Ct. App. 1995) (appellate court need not address "amorphous and insufficiently developed" argument).

¶ 40. Parrish argues, however, that the trial court, in its post-commitment decision, utilized an improper standard by offering its own assessment of the value of Dr. Maskel's report rather than the assessment of a "hypothetical reasonable factfinder." Thus, Parrish contends, "the issue before the [post-commitment] trial judge here was not whether *he* would have refused to commit if testimony challenging the reliability of actuarial devices [employed by Dr. Doren] had been presented, but whether a reasonable

factfinder—be it a judge or a jury—might have had a reasonable doubt of Parrish's future dangerousness if that element had been disputed."

¶ 41. We disagree. Significantly, Parrish does not argue that the post-commitment motion judge, who was the trial judge, was *not* a "reasonable fact finder." Parrish offers nothing to suggest that a reasonable post-commitment motion judge must stretch his or her imagination to conjure up some sort of *other* reasonable fact finder who might have viewed the evidence differently. While we do not automatically accept a post-conviction or post-commitment court's rationale confirming its earlier decision, *see State v. Anderson*, 222 Wis. 2d 403, 408, 588 N.W.2d 75 (Ct. App. 1998), Parrish provides no law or logical basis on which we would reject the reasonable conclusion of a post-commitment judge when that judge, by virtue of having been the fact finder at trial, is in the best position to consider whether additional information would have altered his or her commitment decision.

¶ 42. Here, the post-commitment court was in the singularly advantageous position to determine the question of prejudice and, based on the post-commitment motion and Dr. Maskel's report, reasonably did so without any need for an evidentiary hearing. Accordingly, we reject Parrish's claim that defense counsel rendered ineffective assistance.

### E. Additional Constitutional Challenges

¶ 43. Finally, Parrish renews the several constitutional challenges he presented in his post-commitment motion. *See* ¶ 11, above. While his legal arguments were substantial, similar ones have been rejected in recent cases decided subsequent to the briefing in this

appeal. *See State v. Williams*, 2001 WI App 263, 249 Wis. 2d 1, 637 N.W.2d 791, *review denied*, 2002 WI 111, 256 Wis. 2d 63, 650 N.W.2d 840 (Wis. Jul. 26) (No. 00–2899); *State v. Rachel*, 2002 WI 81, 254 Wis. 2d 215, 647 N.W.2d 762. On these issues, Parrish offers no theory that pushes past the controlling holdings of these cases.

*By the Court.*—Judgment and orders affirmed.