IN RE the COMMITMENT OF Shawn D. SCHULPIUS:
STATE of Wisconsin, Petitioner-Respondent,

v.

Shawn D. SCHULPIUS, Respondent-Appellant.†

Court of Appeals

*No. 02–1056. Oral argument January 6, 2004.—
Decided February 3, 2004.*

2004 WI App 39

(Also reported in 678 N.W.2d 369.)

† Petition to review granted 4-20-04.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Ellen Henak*, assistant state public defender of Milwaukee. There was oral argument by *Ellen Henak*.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Warren D. Weinstein*, assistant attorney general. There was oral argument by *Warren D. Weinstein*.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. FINE, J. Shawn D. Schulpius appeals from the order denying his motion to "Enforce the Trial Court's Decision and Order of October 27, 1999 and for a Final Order" directing that he be released from the custody to which he was committed as a "sexually violent person" under Wis. Stat. ch. 980. (Uppercasing omitted.) The encompassing issue presented is whether Schulpius, who was properly committed under ch. 980 as a dangerous sex offender, must be released from that commitment because the responsible government agencies did not comply with subsequent trial-court orders directing that he be placed in the community under supervised release, even though the trial court determined at the most recent court hearing that Schulpius is substantially likely to re-offend if released from his confinement—either under supervised release or outright. We hold that he is not entitled to such release. Accordingly, we affirm.

## I.

¶ 2. The procedural history in this case is byzantine and we set it out in some length because it gives needed context. In brief, Schulpius was found to be a "sexually violent person" as that term is defined in Wis. Stat. ch. 980, and was committed to the secure custody of the Department of Health and Family Services for in-patient treatment. Almost immediately, however, the trial court issued a series of orders that directed either the Department or Milwaukee County, or both, to prepare a plan to treat Schulpius on supervised release in the community. When, after several years, Schulpius was still being detained in secure custody, the trial court ruled that Schulpius's constitutional rights were

430

violated and ordered his immediate release. Subsequently, however, the trial court found that Schulpius was no longer suitable for supervised release because of his dangerous mental condition. The history has essentially two phases, which we discuss in turn.

A. *Phase One.*

¶ 3. In December of 1991, Schulpius, then one week short of eighteen, pled guilty to and was convicted of first-degree sexual assault of a four-year-old boy for whom he was baby-sitting. *See* WIS. STAT. § 948.02(1) (1991–92). Schulpius, who had previously been waived to adult court for the crime, was sentenced to a stayed prison term of five years and was put on probation for five years. Schulpius's probation was later revoked because he had incest-related pornographic video tapes and magazines in his possession, and repeatedly did not comply with the rules of his probation. Schulpius started to serve his previously stayed five-year term. In October of 1995, shortly before Schulpius was to be released, the State filed a petition seeking his commitment under WIS. STAT. ch. 980 as a sexually violent person.

¶ 4. The baby-sitting sexual assault of the four-year-old boy was not the first time Schulpius had sexually assaulted a child. Schulpius's history of deviant sexual criminality was related in a psychological assessment submitted to the trial court in support of the State's October 1995 WIS. STAT. ch. 980 petition. What the psychologist characterized as Schulpius's "first group of sex offenses" started when Schulpius was fourteen. "He began molesting his step-sister (approximately age 6 at the time), on at least a once weekly basis for six months to a year before he was apprehended. Mr. Schulpius describes his offense as fondling and per-

431

forming oral sex on his step-sister." As a result, Schulpius was placed at a mental-health facility where, according to the psychological assessment, Schulpius "received approximately three months of individual therapy treatment." Nevertheless, some six months later, Schulpius "began re-assaulting his step-sister again including fondling her, having her fondle him, performing oral sex on her and rubbing his penis between her legs." During this time, Schulpius also "fondled his one[-]year[-]old half-brother."

¶ 5. Schulpius explained his relapse to the psychologist, telling her, as recounted in her psychological assessment, that "the treatment providers" at the mental-health facility to which he was sent after his apprehension for sexually assaulting his six-year-old step-sister "were not prepared to deal with his sex offenses in treatment." Schulpius also claimed that his assault on his one-year-old half-brother was, as also reported in the psychological assessment, "an impulsive act" while Schulpius was changing the baby's diaper.

¶ 6. When Schulpius was fifteen, he began assaulting girls in his neighborhood and, also, one of his biological sisters, who was then approximately eleven or twelve. He also resumed sexually assaulting his younger step-sister. Schulpius was then sent to another facility for treatment. The psychological assessment submitted in support of the October, 1995, petition recounts:

> [Schulpius] reports that the treatment may have been effective to prevent him from re-offending, but he was too immature to apply himself at that time in the treatment setting. He reports he cooperated at times, but this mainly involved putting up a front of cooperating, for example writing out very lengthy answers to his assignments, but cramming them with useless

information, so that he might avoid working on his offenses or disclosing information.

Schulpius left the treatment facility when he was seventeen and entered a group home. When he lost one of his two part-time jobs, he "offered to babysit for a woman friend's young son." The child was the four-year-old boy whom Schulpius assaulted in the waiver-to-adult-court criminal case that ultimately resulted in his imprisonment following the revocation of his probation.

¶ 7. Following a June 14, 1996, WIS. STAT. ch. 980 bench trial, the trial court found that Schulpius was a sexually violent person. *See* WIS. STAT. §§ 980.05 (trial), 980.01(7) (1995–96) (definition of "sexually violent person").[1] A pre-dispositional-investigation report was prepared by Dennis M. Doren, Ph.D., psychology director of forensic/adult services at the Mendota Mental Health Institute. In the course of Dr. Doren's investigation, Schulpius admitted to him that he had, as phrased by Dr. Doren, sexually assaulted others for which he "was never prosecuted (involving reportedly about 20 different victims at least[,] mostly where he 'took advantage of the person')." After reviewing possible placements and treatment facilities, as well as what Dr. Doren characterized as Schulpius's then "relatively new earnest efforts to improve himself and learn how to avoid

---

[1] WISCONSIN STAT. § 980.01(7) (1995–96) defined "sexually violent person" as including "a person who has been convicted of a sexually violent offense . . . and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." This is also the definition today. § 980.01(7) (2001–02). "Sexually violent offense" was defined to include violations of WIS. STAT. § 948.02(1). § 980.01(6)(a) (1995–96). It does so today. § 980.01(6)(a) (2001–02).

committing sexual violent acts," Dr. Doren concluded that, given the reality of what was available in the community and Schulpius's needs, Schulpius should be committed for treatment at a secure facility. Dr. Doren explained:

> Ultimately, this examiner believes that Mr. Schulpius currently has positive intentions for his community adjustment, and much prefers the idea of never re-committing a sex crime. The situation into which he would be released, however, simply seems too insufficient in its educational and supervisory resources to work effectively for him at this time to ensure community safety. Under the above listed circumstances, with the enormous stress of learning to develop a new life in ways unfamiliar to him, with inadequately developed new skills (i.e., treatment effect to date) to address the emotional difficulties he would face, and with the freedom to act as he felt at the time based on his stress, it seems too likely to this examiner that Mr. Schulpius would (like other people in analogous circumstances) go back to old patterns of coping/behavior. This would, for Mr. Schulpius, include testing limits (including of his supervised release set of rules, his own personal "red flags") and actual sexual offense recidivism. From this examiner's perspective, the risk to the community is simply too great at this time to recommend that Mr. Schulpius receive his treatment relevant to his Chapter 980 commitment within a community setting.

Dr. Doren, however, tinctured his recommendation that Schulpius be committed to a secure facility with the acknowledgment that it was based, in part at least, on "the lack of apparent alternatives."

¶ 8. The trial court followed Dr. Doren's recommendation and, on July 31, 1996, ordered Schulpius "committed to institutional care . . . [i]n a secure mental health unit or facility" pursuant to WIS. STAT. §§ 980.06

and 980.065 (1995–96). The trial court, however, concluded that Schulpius was more suitable for supervisory release if there was an appropriate community resource, and, in a "supplemental order" issued on August 8, 1996, started the mechanism to find one:

> At the commitment hearing, I found that two particular things were required with respect to [Schulpius's] placement: (1) a significant level of supervision, such as is available in residential treatment or a "half-way house" setting; and (2) access to an appropriate sexual assault treatment program. I also found that neither [Schulpius's] circumstances [n]or the protection of the community required prison level security, by which I intended to indicate that placement in a secure mental health facility was not necessary. I ordered institutional care in a secure placement only because the record did not support a commitment order to any "other facility" or to any "supervised release" which would have assured the necessary residential supervision and treatment programming.

> I made these findings in order to assist the Department in complying with the statutory requirement that it "shall arrange for control, care and treatment of the person in the least restrictive manner consistent with the requirements of the person and in accordance with the court's commitment order." Sec. 980.06(2)(b), Stats. [(1995–96)].[2]

---

[2] Under Wis. Stat. § 980.06(2)(b) (1995–96), the trial court's "order of commitment" could "specify either institutional care in a secure mental health unit or facility . . . or supervised release." By 1999 Wis. Act 9, § 3223h, the legislature changed the law to eliminate the "supervised release" option, effective October 29, 1999. 1999 Wis. Act 9, § 9323(2)(ag). Thus, § 980.06 (2001–02) provides: "A commitment order under this section shall specify that the person be placed in institutional care." We upheld the automatic initial-commitment to institutional care in *State v. Ransdell*, 2001 WI App 202, ¶¶ 5–10, 247 Wis. 2d

(Footnote added.) The trial court ordered the Department to determine if:

- there was "anywhere in Wisconsin" a facility "where placement could reasonably be expected within the next four months" for Schulpius that would provide him with the necessary "supervision and access to treatment"; and

- such a placement was available, to draft either a placement plan or a statement of "why the Department believes that such placement should not be made."

The trial court also directed the Department to explain why, "[i]f such placement is not available or not considered appropriate" for Schulpius, "the Department is presently unable to provide a less restrictive placement [than the secure-custody commitment the trial court ordered on July 31] appropriate for" Schulpius's requirements. The trial court further explained:

> This should include a description of any plans to create or provide supervised living for Chapter 980 subjects who do not require confinement in a secure mental health facility. If 'half-way house' or other such placements available to prison inmates and parolees are not available to Chapter 980 subjects, I would like to know why this is the case.

¶ 9. Following an order extending the time for the Department's response, a Forensic Services Supervisor with the Department reported to the trial court on October 28, 1996, that no appropriate placement was available for Schulpius either in Milwaukee County or

613, 619–624, 634 N.W.2d 871, 874–877, and *State v. Williams*, 2001 WI App 263, ¶¶ 7–20, 249 Wis. 2d 1, 8–19, 637 N.W.2d 791, 796–801.

elsewhere in Wisconsin because no facility the Department contacted would accept Schulpius, given his history of recidivism and his failure to cooperate with earlier attempts to treat him. The supervisor told the trial court that the "department's recommendation for Mr. Schulpius at this point is that he should work on developing an adequate relapse prevention plan with treatment staff" at the secure facility, and that "[i]n this way he would hopefully, reduce the risk he presents at this time in a community placement and would be accepted into a residential placement in the future."

¶ 10.   WISCONSIN STAT. § 980.07 (1995–96) required that the Department examine periodically the "mental condition" of a person who "has been committed under s. 980.06 and has not been discharged under s. 980.09." The initial examination must be made "within 6 months after an initial commitment under s. 980.06 and again thereafter at least once each 12 months for the purpose of determining whether the person has made sufficient progress to be entitled to transfer to a less restrictive facility, to supervised release or to discharge." § 980.07(1) (1995–96).[3] In January of 1997, the Department submitted its § 980.07-report to the trial court, and opined that although Schulpius "has made acceptable progress to date," he "has not yet examined his offenses in terms of effective intervention or begun the work needed to develop and master those interventions." The report, signed by a licensed psychologist with the title of "Clinical Director," concluded:

---

[3] WISCONSIN STAT. § 980.07(1) (2001–02) is similar and states that re-evaluations required by that section are "for the purpose of determining whether the person has made sufficient progress for the court to consider whether the person should be placed on supervised release or discharged."

437

[T]o a reasonable degree of professional certainty, it is this examiner's opinion that Mr. Schulpius remains a sexually violent person as defined by Chapter 980 of the Wisconsin Statutes. His understanding of his offenses is incomplete, he has not identified specific interventions to prevent additional acts of sexual violence, he has not mastered those as of yet unidentified interventions. Hence, it is this examiner's opinion, to a reasonable degree of professional certainty, that effective treatment can only be provided within a secure mental health facility as this time.

¶ 11. Despite the unfavorable report, Schulpius sought discharge under WIS. STAT. § 980.09(2) (1995–96), which permitted, and permits today, a person committed under WIS. STAT. ch. 980 to seek discharge without the approval of the Department's secretary. On March 26, 1997, the trial court held a probable-cause hearing at which Schulpius testified. At the hearing's conclusion, the trial court entered an order finding that "probable cause exists to believe that respondent Schulpius, a committed person under Chapter 980 Wisconsin Stats., is still a sexually violent person."

¶ 12. Two days after the WIS. STAT. § 980.09(2) probable-cause hearing, Schulpius sought an order "compelling" the Department to, within sixty days, put him "in residential placement which would provide a significant level of supervision and access to sexual assault treatment programs." On July 15, 1997, the trial court held a hearing on Schulpius's motion, and, according to the docket entries in the record, ordered the Department "to prepare a plan for [Schulpius's] supervised release." An "amended order" was filed that day and directed, "nunc pro tunc to 7–31–96," that Schulpius "be committed to institutional care: . . . [o]n

supervised release as provided under sec. 980.06(2)(c)[,](d), Stats. [(1995–96)]."

¶ 13. Once again, the Department could not find an appropriate facility that would take Schulpius. In a letter to the trial court dated August 6, 1997, the Department indicated that if Schulpius were placed on supervised release, he needed a tailor-made program:

> The Pre-dispositional investigation [prepared by Dr. Doren] indicates that an adequate and appropriate treatment plan in the community which would serve both Mr. Schulpius's needs and the communities [*sic*] need for protection would include half-way house placement followed by placement in the community on electr[on]ic monitoring, intensive long term sex offender treatment with a qualified and experienced provider, and high risk supervision by a Sex Offender Intensive Supervision Program agent through the Department of Corrections.

(Acronyms omitted.) The letter indicated that Schulpius and his lawyer supported Dr. Doren's pre-dispositional-investigation analysis, but that "a plan of this magnitude is not currently available in Shawn Schulpius's county of residence," which was Milwaukee, because Milwaukee County did not have "the breadth and depth of resources necessary to appropriately and adequately supervise Shawn Schulpius as a Sexually Violent Person." On August 12, 1997, the trial court orally ordered Schulpius's supervised release. A written order was entered on August 18, 1997.

¶ 14. The August 18, 1997, order is just more than six pages, and it reveals the trial court's frustration with what it perceived was a fiscally driven approach to dealing with those committed under WIS. STAT. ch. 980:

> My initial commitment order allowed the lack of resources to control the outcome, requiring secure

439

placement only because there was no immediately available alternative, and expressing the expectation that the department would subsequently arrange for a reasonable non-secure placement. I now determine that this resolution of the resources dilemma was incorrect, and I amend the original order to an order for supervised placement. I further order that the department do that which is required by Chapter 980, namely, make reasonable efforts to provide the least restrictive placement appropriate for [Schulpius's] needs.

Although noting that "[i]n the case of Shawn Schulpius, it is not necessary to conclude that resources are irrelevant to the calculus, [or] that the department is required to design and provide unique treatment services for every subject of Chapter 980 who might conceivably be placed with safety in a nonsecure setting," the trial court nevertheless ordered the Department to work with Milwaukee County "in an effort to develop an appropriate plan" for Schulpius, and that "[i]f an existing supervised placement is truly not available, then the department efforts must include the creation of placement which will be supervised by electronic monitoring or direct personal monitoring by a department agent and which will allow for access to a treatment program." (Emphasis in original.) The trial court also ordered the Department to "[s]imultaneously seek to arrange for another county to prepare such a plan" for Schulpius, and, if the Department was "unable to arrange for such a plan, recommend which county should be designated to be ordered to prepare such a plan under sec. 980.[0]6(2)(c)." Further, the trial court reiterated its August 8, 1996, supplemental-order direction that the Department describe, if nonsecure "placement is not available or not considered appropriate" for Schulpius, "any plans to create or provide supervised

440

living for Chapter 980 subjects who do not require confinement in a secure mental health facility," as well as why " 'half-way house' or other such placements available to prison inmates and parolees" might not be available to "Chapter 980 subjects."

¶ 15.  One month later, the Administrator of the Department's Division of Care and Treatment Facilities responded. The bottom line was that the Department still could not place Schulpius as the trial court had directed. The Administrator explained that:

- "the 'outpatient' treatment system is adequate as designed for persons who are no longer in denial, have completed intensive treatment and have developed an adequate relapse prevention plan, all of the treatment components necessary to prepare a sex offender clinically for outpatient treatment" but that Schulpius did not fall within that group;

- "Milwaukee County has no residential facilities that will accept sex offenders";

- in seeking to place Schulpius in a suitable facility outside Milwaukee County, the Department contacted nine residential facilities that "have accepted sex offenders into their programs in the past," but that none would accept Schulpius, and, further, no county government would develop "a supervised release plan for a 'non-resident' of their county";

- the Department also tried to place Schulpius in independent-living facilities with which the Department of Corrections had arrangements, but "none of them were willing to rent an apartment or room to the Department for a person who had previously committed a sexual offense";

441

- "[o]ther than contracting with a reputable residential facility or independent housing provider, the only currently available alternative means of securing a residential placement for an individual on supervised release under ch. 980 would be for the Department to take the unprecedented step of renting an apartment on the open housing market without disclosing to the landlord the background of the prospective tenant. However, this approach would clearly frustrate the public policy expressed by the legislature in sex offender community notification laws. Therefore, the Department will not pursue this option unless the Court explicitly directs the Department to do so"; and

- the Department could not recommend a county that the trial court might order to "prepare a plan for Mr. Schulpius."

The Administrator opined that "[t]he Department believes it has made a diligent effort" to find a placement for Schulpius but was unable to do so because of Schulpius's "history of noncompliance with facility rules during past community placements, together with his relative lack of progress in treatment to date."

¶ 16.  By letter dated January 29, 1998, the Department notified the trial court that it had found a "possible placement" for Schulpius in Pepin County. But within one week, however, the sheriff of Pepin County objected that the facility proposed by the Department was in a mobile-home park near a similar facility where there were "39 children under the age of 18." The sheriff also wrote that Pepin County was Wisconsin's second smallest county, with a population of "just over 7,500,"

and that "[w]e do not have 24–hour law enforcement coverage." Nothing came of the proposed Pepin County placement.

¶ 17. Schulpius was given another WIS. STAT. § 980.07 periodic re-examination in January of 1998. In a report dated January 30, 1998, the clinical director and licensed psychologist at the Department's secure WIS. STAT. ch. 980 facility opined "to a reasonable degree of professional certainty" that Schulpius "remains a sexually violent person as defined by Chapter 980 of the Wisconsin Statutes." Although the psychologist indicated that he believed that Schulpius "has made progress within this program," he also opined, again "to a reasonable degree of professional certainty, that release would be premature and that effective treatment can only be provided within a secure mental health facility at this time."

¶ 18. On February 16, 1998, Schulpius sought "dismissal" of the order committing him under WIS. STAT. ch. 980, alleging that "as applied" to him, the chapter was unconstitutional because the Department had not complied with the trial court's direction that he be placed in the community on supervised release. Following hearings on January 25 and 27, 1999, the trial court denied Schulpius's dismissal motion. On January 28, 1999, the trial court entered a written order directing Milwaukee County to present a supervised-release plan for Schulpius by February 17, 1999, and, further ordered that the "State of Wisconsin will be responsible for the funding required to implement the plan." The order also recited that the trial court's August 18, 1997, order, which directed that Schulpius be placed on supervised release and that the Department prepare a plan for Schulpius, "remains in effect." In the meantime, Schulpius had his annual

443

re-examination under WIS. STAT. § 980.07, and in a January 15, 1999, report transmitted to the trial court, the examining psychologist opined that, "to a reasonable degree of psychological certainty," Schulpius was still a sexually violent person and that his commitment "should be continued."

¶ 19. On February 12, 1999, the State sought reconsideration of the trial court's order placing Schulpius on supervised release, and also sought a concomitant order revoking Schulpius's *de jure* "supervised release status." The State's motion characterized Schulpius's "position" as "anomalous" because, although the trial court placed Schulpius on supervised release, Schulpius was still being held at the secure Department mental-health facility.

¶ 20. By letter dated February 16, 1999, Milwaukee County notified the trial court that although the County "has made and is making a good faith effort to comply with the court's order and with the requirements of the underlying statute, s. 980.06(2)(c)," it "has not been possible to develop an appropriate plan in final form during the brief period since January 28." On February 22, 1999, Schulpius renewed his motion to "dismiss" the order committing him to the secure mental-health facility on the ground that WIS. STAT. ch. 980 was being unconstitutionally applied to him. By order entered February 22, 1999, the trial court: extended to March 24, 1999, the time for Milwaukee County to file a plan; denied the State's motion for reconsideration; and set a hearing date on the State's motion to revoke Schulpius's supervised-release status. The trial court also reiterated its earlier denial of Schulpius's motion to dismiss the commitment order.

¶ 21. On March 23, 1999, Milwaukee County wrote to the trial court reporting on its progress in

444

formulating a plan for Schulpius's supervised release. The plan was incomplete in two respects: the problem of finding suitable housing for Schulpius was still unresolved, and Schulpius's professed desire to take Depo-Provera, a drug that, according to the letter, "has been indicated to repress sexual desires and physical sexual capability," but with "certain risks associated with its use," had not yet been fully evaluated.

¶ 22. By letter dated April 5, 1999, the Department submitted to the trial court what it characterized as an "updated reexamination" under Wis. Stat. § 980.07, apparently to supplement the January 15, 1999, report. The examiner again opined, "to a reasonable degree of professional certainty," that Schulpius was still a sexually violent person who needed to remain in the secure mental health facility. A May 10, 1999, addendum to the report indicated that although Schulpius had progressed in some areas he also displayed an "extremely negative and sarcastic" attitude and was "demeaning to peers and rude and hostile towards staff."

¶ 23. On May 12 and 14, 1999, the trial court held evidentiary hearings, both on the State's motion for reconsideration or vacatur of the orders directing that Schulpius be placed on supervised release, and on Schulpius's renewed motion to dismiss. On September 9, 1999, the trial court issued a written decision and order denying the State's motion, and finding "that supervised release continues to be appropriate." The trial court concluded that as a matter of law "supervised release must be ordered unless the court is satisfied that it is 'much more likely than not' that the person will engage in acts of sexual violence if not securely confined," and, noting "that the clinical opinions of experts are of little or no value in predicting future

445

behavior," also concluded that the State had not proved that Schulpius presented that risk.[4]

¶ 24.  On October 27, 1999, following a hearing held on October 21, 1999, the trial court issued a fifteen-page written decision and order. The trial court:

- recounted that Schulpius "continues to be held in secure custody under a Chapter 980 order despite a court order entered over three years ago instructing the department to arrange for supervised release and despite a dispositional order entered more than two years ago requiring supervised release";

- agreed with Schulpius that "application of Chapter 980" to him "has been in violation of our state and federal constitutions";

- opined that "since the constitutional violation arises from the unlawful imposition of secure custody, this finding requires that [Schulpius] be release[d] from such custody"; and

- concluded that the constitutional violation "does not otherwise deprive the court of jurisdiction under Chapter 980."

The trial court ordered "that any order in these proceedings by which [Schulpius] is presently being held in secure custody at the Wisconsin Resource Center [the secure mental-health facility for persons committed

---

[4] As we have seen in footnote one, WIS. STAT. § 980.01(7) defines a "sexually violent person" as someone "who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." *State v. Curiel*, 227 Wis. 2d 389, 406, 597 N.W.2d 697, 704 (1999), interpreted "substantially probable" to mean "much more likely than not."

446

under Wis. Stat. ch. 980] is vacated, and, assuming there is no other lawful basis on which [Schulpius] may be detained, it is further ordered that he be released forthwith from the Wisconsin Resource Center and from the physical custody of the Department and State of Wisconsin." (Footnote omitted.) The trial court denied Schulpius's motion to dismiss "[i]n other respects." The trial court also ordered:

> [Schulpius] otherwise remains subject to the provisions of Chapter 980 and in the custody of the Department pursuant to sec. 980.06(1) and the Amended Judgment and Commitment Order of July 15, 1997. He remains in the status of a person found *appropriate* for supervised release pursuant to sec. 980.06(2)(b), but not yet *placed* on supervised release pursuant to subsections (c) and (d). It is therefore further ordered that he reside in Milwaukee [C]ounty, an immediately adjacent county, or other location approved by the court or the Department. It is further ordered that he make himself available to the designated representative of the Department and that he comply with such further orders of the court as may be entered.

(Emphasis in original.) The trial court also issued two separate orders on October 27, 1999, staying, pending the State's appeal, its order directing that Schulpius be released from custody.

¶ 25. At a hearing held on January 31, 2000, the trial court found that the Department's failure to seek authority from the legislature to "create" a program suitable for Schulpius was "willful disobedience" of its orders, found the Department in contempt, and imposed a fine of $1,000 per day. The trial court summarized its determinations in its order entered that day:

> For reasons set forth on the record, I found that the evidence did not support a finding that the Department

447

had willfully disobeyed the court's orders based on either (1) the failure of the Department to secure a supervised release placement or (2) any failure of the Department to make sufficient efforts to secure such a placement through private agencies . . . .

For reasons set forth on the record, I did find that the Department's failure to make any effort to obtain the authority to create an appropriate supervised residential placement for [Schulpius] did constitute disobedience and obstruction of the court's orders. I further found that such disobedience, resistance and obstruction of the court's orders was willful in that as early as October 28, 1996, and certainly long before today's date, the Department knew or should have known that the absence of such authority would assure that it could not prepare a reasonable plan for supervised release or that its failure to obtain such authority was practically certain to assure that result.

In its oral decision, the trial court opined that it was "satisfied in this particular case that there were Department employees who from time to time made genuine efforts to find a placement and that the failure was due not to the lack of hours being spent looking for something but a lack of resources that would be inclined to accept [Schulpius] under these circumstances." The trial court stayed imposition of the fine. On February 4, 2000, the Department's secretary sent a letter to the legislature seeking "statutory authority and funding to purchase or construct facilities and authority to force [sex-offender] placement" in resisting communities. On February 16, 2000, the trial court entered an order finding that the secretary's February 4 letter "satisfactorily purges the contempt found in the January 31, 2000, order of this Court," and, accordingly, "vacated in its entirety" the contempt finding and imposition of sanction.

¶ 26.   In the meantime, on January 13, 2000, the State appealed from the trial court's order of October 27, 1999, and, on August 29, 2000, the supreme court granted Schulpius's petition to bypass this court. *State v. Schulpius*, 2000 WI 102, 237 Wis. 2d 264, 618 N.W.2d 753; *see* Wis. Stat. § 808.05(1). Subsequently, after the State sought to dismiss the appeal voluntarily because the trial court had, on November 29, 2000, granted the State's motion for reconsideration and determined that Schulpius was no longer suitable for supervised release, the supreme court vacated that order, and remanded the appeal to this court. *State v. Schulpius*, 2001 WI 69, 244 Wis. 2d 401, 628 N.W.2d 349 (per curiam). On remand, we dismissed the appeal. *State v. Schulpius*, No. 00–0095, unpublished slip op. (WI App Oct. 3, 2001). We now discuss the trial court's November 29, 2000, decision, which sets the immediate stage for this appeal.

B. *Phase Two.*

¶ 27.   The trial court's November 29, 2000, decision reversed course and, following an evidentiary hearing, found that as of that date "it is much more likely than not that [Schulpius] will reoffend at some point in the future, even while supervised." The trial court's decision related the following evidence:

- application to Schulpius of the Structured Risk Assessment model for sex offenders, and supporting testimony by Susan Sachsenmaier, Ph.D., a Department psychologist, and David Thornton, Ph.D., the model's architect who is also director of psychological services for Her Majesty's Prison System in Great Britain, which "caused [the trial court] to view [Schulpius] as

representing a higher general risk of re-offense and to hold that view with increased confidence";

- Dr. Sachsenmaier "has unequivocally maintained that [Schulpius] represents an extremely high risk for re-offense *even while under the type of supervision posited by the court.*" (Emphasis in original.)[5]; and

- Schulpius's aggressive, threatening behavior toward Dr. Sachsenmaier when she was at the secure mental-health facility, which Dr. Sachsenmaier wrote in her report "demonstrates poor self-management skills, poor interpersonal skills, and ineffective control of his emotions and reasoning processes."[6]

---

[5] Indeed, although not quoted specifically in the trial court's decision, Dr. Sachsenmaier's May 26, 2000, report, on which the trial court relied in part, was emphatic in its concern for the safety of potential future victims:   "Mr. Schulpius is a polymorphously perverse sex offender. There is no doubt in my mind that as soon as he has an opportunity he will reoffend."

[6] This is a more complete excerpt from Dr. Sachsenmaier's report:

At no point did he express any sign that he understood the irrational and agitated behavior he was displaying.

Mr. Schulpius' behavior in this situation demonstrates poor self-management skills, poor interpersonal skills, and ineffective control of his emotions and reasoning processes. This is significant in light of the fact that many of his victims have told him they did not want to have sexual contact with him, or any more sexual contact, but he persisted until he got what he wanted through intimidation or manipulation. This is an example of a sex offender's offense cycle characteristics surfacing within the facility in response to a minimal, non-sexual trigger. It is an example of aggressive thinking.

While recognizing its earlier assessment that predictions of future dangerousness were generally problematic, the trial court was "satisfied that the opinions of persons who have studied and worked with sex offenders have value . . . [and] there are reasons to consider that they may be of greater value tha[n] the lay conclusions a judge might reach from the same evidence." In assessing Schulpius's aggressive behavior to Dr. Sachsenmaier, the trial court "acknowledged that such incidents might well reflect, to some degree, Schulpius' frustration with his unlawful confinement, an unlawful confinement which has persisted for more than four years." (Footnote omitted.) Although the trial court opined that in its view "[i]t would be fundamentally unfair if unlawful confinement were to cause behavior which is then use[d] to justify lawful confinement[,] . . . to the extent that these incidents speak to a lack of judgment and self-control . . . they are relevant to the assessment of risk."

¶ 28. The trial court granted the State's motion for reconsideration, and vacated its prior orders for supervised release. The penultimate sentence to the trial court's November 29, 2000, decision provided: "It is further ordered that Shawn Schulpius be committed to institutional care pursuant to section 980.06, still subject, however, to the decision and order requiring release entered in this case on October 27, 1999." Simply put, the trial court ordered that Schulpius be committed to the Department's secure custody, but *also* reaffirmed its earlier order that directed that he be released "forthwith" from that custody because of what the trial court viewed as violations of Schulpius's constitutional rights. As noted, the order directing Schulpius's release had been stayed pending the State's appeal.

451

¶ 29. Some time after the trial court issued its November 29, 2000, decision, the Honorable John Franke, who had presided over Schulpius's WIS. STAT. ch. 980 case since its inception, was succeeded by the Honorable John J. DiMotto, pursuant to the rotation-of-judges plan in Milwaukee County. *See* SCR 70.23(3).

¶ 30. Dr. Sachsenmaier conducted Schulpius's July, 2001, WIS. STAT. § 980.07 re-examination. Again, she concluded that Schulpius was too dangerous to be released from secure custody.

> Mr. Schulpius has been diagnosed with Pedophilia and Antisocial Personality Disorder, both of which qualify as a mental disorder as defined by Chapter 980. That is, each is a condition that is acquired or congenital, affects his emotional or volitional capacity, and together or separately, predisposes him to commit sexually violent acts as defined by Chapter 980. It is the opinion of this examiner that Mr. Schulpius' response to treatment to date has not been sufficient to substantially reduce the likelihood of future sexually violent offenses.
>
> It is therefore this examiner's opinion, to a reasonable degree of scientific and psychological certainty, that Mr. Schulpius remains a Sexually Violent Person as defined by Chapter 980 of the Wis. Statutes. Hence, with a reasonable degree of scientific and psychological certainty, it is this examiner's opinion that Mr. Schulpius should not be considered by the court at this time for supervised release or discharge from Chapter 980 status as a Sexually Violent Person. Mr. Schulpius presents a substantial probability ("much more likely than not") that he will commit another sexually violent offense should he be placed in the community, even with reasonable community safeguards. Therefore, this examiner recommends continued intensive treatment in a confined setting.

¶ 31. On September 19, 2001, Judge DiMotto held a probable cause hearing under WIS. STAT. § 980.09(2)(a) to determine whether there should be an evidentiary hearing to determine if Schulpius was still a "sexually violent person." By order entered October 1, 2001, the trial court determined that there were no "facts that warrant a further hearing" on that issue, and that Schulpius was to remain "committed to the custody" of the Department "for care, control, and treatment in a secure mental health facility until further order of a court of competent jurisdiction."

¶ 32. On November 26, 2001, Schulpius filed a "motion to enforce the trial court's decision and order of October 27, 1999 and for a final order which releases [Schulpius] from physical custody of the State of Wisconsin Department of Health and Family Services." (Uppercasing and capitalization omitted.) The trial court denied that motion in an order dated January 17, 2002, and it is from that order that Schulpius currently appeals.[7]

## II.

¶ 33. Schulpius seeks either immediate release from his WIS. STAT. ch. 980 commitment or, alternatively, his immediate release from secure custody. He argues that he is entitled to one of these alternatives because the responsible government entities did not comply with the trial court's orders directing his supervised-release placement, and that this deprived him of both substantive and procedural due process. This presents legal issues that we analyze *de novo. See*

---

[7] On August 13, 2003, the supreme court denied Schulpius's petition to bypass this court. *State v. Schulpius*, 2003 WI 126, 265 Wis. 2d 421, 688 N.W.2d 650; *see* WIS. STAT. § 808.05(1).

*State v. Post*, 197 Wis. 2d 279, 301, 541 N.W.2d 115, 121 (1995), *cert. denied*, 521 U.S. 1118.[8]

---

[8] Both parties raise peripheral issues that are governed by settled law and may thus be dealt with briefly. First, the State contends that the trial court's November 29, 2000, decision was a final appealable order because no subsequent order was ever entered, and that therefore, Schulpius's appeal from Judge DiMotto's order does not also bring before us for review what Judge Franke did on November 29, 2000. We disagree. The order on its face unambiguously contemplated entry of a reifying order when, in the last sentence, the trial court wrote:   "As required by SCR 70.15 [*sic*—SCR 70.15 establishes "the judicial conference of Wisconsin"], a form order for such commitment will be separately entered." Thus, the November 29 document was not on its face a "final order," even though Judge Franke later decided that entry of a separate order was not necessary. *Radoff v. Red Owl Stores, Inc.*, 109 Wis. 2d 490, 493–494, 326 N.W.2d 240, 241–242 (1982). Moreover, as we note in the main body of this decision, Schulpius does not challenge Judge Franke's determination in the November 29 document that as of that date he was not suitable for supervised release.

Second, Schulpius argues that the trial court did not have jurisdiction to grant on November 29, 2000, the State's motion for reconsideration because the case was then on appeal. We disagree. WISCONSIN STAT. § 808.075(1) specifically permits the trial court to entertain motions for reconsideration pending appeal and there is nothing in either § 808.075 or in WIS. STAT. ch. 980 itself to the contrary. As the supreme court recently reiterated:

> Motions for reconsideration pending appeal serve an important function. A circuit court's reconsideration may obviate the need for an appeal. Allowing such motions could, therefore, not only spare the parties unnecessary expense, but could also serve the goal of judicial economy. Even if an appeal is not avoided, a motion for reconsideration enables a circuit court to hone its analysis and thus expedite the appellate review process.

*Highland Manor Assocs. v. Bast*, 2003 WI 152, ¶ 17, 268 Wis. 2d 1, ___, 672 N.W.2d 709, 713 (footnote omitted).

Third, Schulpius also argues, in an undeveloped two-paragraph section in his appellate brief-in-chief, that the State's motion for reconsideration was "untimely" because it was made "almost 3 2/3 years after the court issued its order granting supervised release on August 18, 1997." Motions for reconsideration may, however, be made under Wis. Stat. Rule 806.07(1)(h) "within a reasonable time." Rule 806.07(2); *see State v. Sprosty*, 2001 WI App 231, ¶¶ 16–17, 248 Wis. 2d 480, 493–494, 636 N.W.2d 213, 220 (recognizing applicability of Rule 806.07(1)(h) to Wis. Stat. ch. 980 cases). Although neither the State nor the trial court referenced the rule, a pleading stating cause for relief need not specify the label under which that relief is sought. *See Strid v. Converse*, 111 Wis. 2d 418, 422–423, 331 N.W.2d 350, 353 (1983) (complaint). Moreover, the State's motion was based on contemporaneously acquired evidence, including Schulpius's aggressive, threatening behavior toward Dr. Sachsenmaier, and was thus not a new spin on old facts. *See State v. Williams*, 2001 WI App 155, ¶¶ 12–17, 246 Wis. 2d 722, 729–731, 631 N.W.2d 623, 626–627 (use of Rule 806.07(1)(b) to modify an existing order for supervised release of a person committed under ch. 980 impermissible when evidence "recycl[ed]" and reformulat[ed]").

One of the "principal purposes" of Wis. Stat. ch. 980 is to protect the public from sexually violent predators "who are at a high risk to reoffend." *State v. Carpenter*, 197 Wis. 2d 252, 271, 541 N.W.2d 105, 112 (1995), *cert. denied sub nom. Schmidt v. Wisconsin*, 521 U.S. 1118. We decline to adopt Schulpius's undeveloped contention that we should put a time-limit on the State's ability to bring new information to the trial court that bears on the risk that a sexually violent person ordered to be placed on supervised release may pose to the community. *Cf.* Wis. Stat. §§ 980.06(2)(d) (1995–96) (person on supervised release may be taken into custody, and the Department may

the constitutional right to due process—procedural and substantive. Thus, irrespective of how dangerous a sexual predator might be, he or she cannot be deprived of his or her liberty unless a statute authorizes the deprivation—either by criminal process (conviction and sentence) or by civil process. WISCONSIN STAT. ch. 980 is a civil statute, *State v. Carpenter*, 197 Wis. 2d 252, 258, 265–272, 541 N.W.2d 105, 107, 110–113 (1995), *cert. denied sub nom. Schmidt v. Wisconsin*, 521 U.S. 1118, and must satisfy procedural due process—that is, the mechanism of adjudication and disposition must minimize the risk of an erroneous deprivation, *see Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The essence of this right is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Id.*, 424 U.S. at 333 (quoted source omitted).[9] Chapter 980 has survived various, albeit related, procedural-due-process challenges. *See State v. Curiel*, 227 Wis. 2d 389, 414–415,

seek revocation of supervised release, if "the safety of others requires that supervised release be revoked"); 980.08(6m) (2001–02) (person on supervised release may be taken into custody, and the Department may seek revocation of supervised release, if "the safety of others requires that supervised release be revoked"); *see State v. Shaffer*, 96 Wis. 2d 531, 545–546, 292 N.W.2d 370, 378 (Ct. App. 1980) (we will not develop appellant's argument). Further, Schulpius does not argue that the State's reconsideration motion was defective because it was in essence a § 980.08(6m) petition to revoke his supervised-release status. *See State v. Morford*, 2004 WI 5, 268 Wis. 2d 300, 674 N.W.2d 349. Accordingly, that matter is waived. *See Reiman Assocs., Inc. v. R/A Adver., Inc.*, 102 Wis. 2d 305, 306 n.1, 306 N.W.2d 292, 294 n.1 (Ct. App. 1981) (matter not argued is waived).

[9] Criminal-law statutes are subject to a different analysis because, "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

456

597 N.W.2d 697, 708–709 (1999) (vagueness); *State v. Zanelli*, 223 Wis. 2d 545, 556–558, 589 N.W.2d 687, 693–694 (Ct. App. 1998) (fair notice of triggering mental status); *State v. Kienitz*, 221 Wis. 2d 275, 309–310, 585 N.W.2d 609, 623 (Ct. App. 1998) (vagueness).

■

¶ 35. Substantive due process, on the other hand, protects persons from government conduct that either " 'shocks the conscience' " or "interferes with rights 'implicit in the concept of ordered liberty.' " *United States v. Salerno*, 481 U.S. 739, 746 (1987) (quoted sources omitted). This is true irrespective of the procedural due-process safeguards. *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998). For example, although the United States Supreme Court once sanctioned the involuntary sterilization of persons with severe mental deficiencies, *Buck v. Bell*, 274 U.S. 200, 207–208 (1927), it is doubtful whether the eugenics law upheld in *Buck* would pass scrutiny today, irrespective of the procedural safeguards used to select those to whom such a law would be applied, *see Board of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 369 n.6 (2001); *Fieger v. Thomas*, 74 F.3d 740, 750 (6th Cir. 1996).

■

¶ 36. A statute that is due-process compliant on its face may, however, "pinch . . . in its application"; that is, be applied in such a way as to violate a person's due-process rights. *Terminiello v. City of Chicago*, 337 U.S. 1, 6 (1949). This is the nub of Schulpius's complaint here. Although Schulpius contends that a person who claims that a constitutional statute is unconstitutional as applied need not prove the as-applied invalidity beyond a reasonable doubt, which is the standard that applies to facial-challenges, *Post*, 197 Wis. 2d at 301, 541 N.W.2d at 121, the law is otherwise, *State v. Joseph*

*E.G.*, 2001 WI App 29, ¶ 5, 240 Wis. 2d 481, 486, 623 N.W.2d 137, 140; *State v. Matthew A.B.*, 231 Wis. 2d 688, 710, 605 N.W.2d 598, 608 (Ct. App. 1999); *see also Federal Hous. Admin. v. Darlington, Inc.*, 358 U.S. 84, 90–91 (1958) (requiring party contending that statute was unconstitutional as applied show the invalidity "beyond a rational doubt").

¶ 37. As we have seen, Schulpius faults various executive agencies for their inability to comply with Judge Franke's orders. The " 'touchstone' " of substantive due process is the protection "against government power arbitrarily and oppressively exercised." *Lewis*, 523 U.S. at 845–846 (quoted source and citation omitted). Further, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.' " *Id.*, 523 U.S. at 846 (quoted source omitted). *Lewis* held that what the Court of Appeals for the Ninth Circuit determined was the "deliberate indifference" to the rights of a sixteen-year-old motorcycle-passenger by a sheriff's deputy who skidded into the boy following a high-speed chase that violated the rules of the deputy's department did not rise to the level of a substantive due-process violation. *Id.*, 523 U.S. at 836–840, 854–855. Thus, whether the failure to comply with Judge Franke's orders deprived Schulpius of substantive due process turns on "whether the behavior of the [responsible] governmental officer [was] so egregious, so outrageous, that it may fairly be said to shock the contemporary conscious," *see id.*, 523 U.S. at 847 n.8, and, additionally, whether the government officer's conduct was either a "deliberate decision[]" to "deprive" Schulpius of his liberty interest, or reflected the officer's "deliberate indifference" to that liberty interest, *see id.*, 523 U.S. at 849–850 (emphasis omitted).

¶ 38. Schulpius points to nothing in the evidentiary record that shows that the failure to implement the trial court's orders was the result of anything but good-faith efforts that did not succeed because of things beyond the control of those to whom the court orders were directed—not the least of which was Schulpius's own history of dangerous sexual predation that the experts unanimously agreed could not be controlled and treated in the community under supervised release. Thus, as we have seen, although Judge Franke initially held the Department in contempt for not seeking authority and funding from the legislature to create a supervised-release facility for Schulpius, Judge Franke not only vacated the contempt when the Department's secretary immediately wrote to the legislature seeking such authority, but, indeed, as we have seen, Judge Franke also:

> found that the evidence did not support a finding that the Department had willfully disobeyed the court's orders based on either (1) the failure of the Department to secure a supervised release placement or (2) any failure of the Department to make sufficient efforts to secure such a placement through private agencies.

■

¶ 39. Significantly, the practicable difficulties faced by the Department and Milwaukee County are material in assessing whether the non-compliance with Judge Franke's orders rises to the level of a substantive-due-process violation. Thus, *Youngberg v. Romeo*, 457 U.S. 307, 320–321 (1982) (quoted source omitted), which concerned the rights to care and treatment of a person involuntarily confined because of his severe mental retardation, recognized that one of the factors in the substantive-due-process calculus—the balancing of " 'the liberty of the individual' and 'the demands of an

organized society' "—included "fiscal and administrative burdens." Accordingly, "[i]n an action for damages against a professional in his individual capacity [alleging injury because the responsible professional departed substantially "from accepted professional judgment"], however, the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability." *Id.*, 457 U.S. at 323; *see also State v. Sprosty*, 227 Wis. 2d 316, 326, 327, 595 N.W.2d 692, 697 (1999) ("In the context of where the person [seeking release into the community on supervised release] may live and what arrangements for treatment are available such things as *the availability of facilities, security, and cost considerations may, in the court's discretion, factor into the court's decision on the appropriateness of supervisory release,*" but, nevertheless, "prior acceptance of the person into those facilities or programs is an inappropriate consideration *at the hearing* on the petition for supervisory release," and "[a]ny consideration of costs or availability of facilities must be in keeping with providing the 'least restrictive' means to accomplish treatment of the person and the protection of the public.") (quoting Wis. Stat. § 980.06(2)(b) (1995–96); emphasis added). Once, of course, a person is determined to be suitable for supervised release, the *statute* prevents the trial court from revoking supervised release solely because of costs or the unavailability of suitable facilities. *Sprosty*, 227 Wis. 2d at 331–335, 595 N.W.2d at 699–701. But that did not happen here; Judge Franke's November 29, 2000, decision assessed Schulpius's *suitability* for supervised release, not the difficulties faced by the responsible entities in complying with his earlier orders. All we hold is that those difficulties are material to the substantive-

460

due-process *constitutional* issue of whether the responsible government entities were acting in good faith. Under *Youngberg* they clearly are.

¶ 40.  Given Schulpius's horrendous history of predatory sexual violence against children, the good-faith inability of the responsible persons to comply with Judge Franke's orders neither shocks the conscience nor trespasses on rights implicit in concepts of ordered liberty. Accordingly, Schulpius has not shown, by any standard, and certainly not beyond "a rational doubt," *Darlington*, 358 U.S. at 91, that he was deprived of substantive due process by the application of Wis. Stat. ch. 980 to him. Moreover, he has also pointed to nothing in the evidentiary record that even hints that any of the procedural safeguards in ch. 980 were either short-circuited, truncated, or ignored by any government actor. Rather, all of ch. 980's procedural safeguards—designed to minimize the risk of error—were applied, scrupulously, to him.

¶ 41.  It is true that Schulpius did not get the supervised release he wanted and to which Judge Franke determined he was entitled. It is also true, as Judge Franke speculated, that Schulpius's frustration over not being able to achieve the supervised release that he undoubtedly believed was within his sight *may* have contributed to what the trial court's November 29, 2000, decision characterized as Schulpius's then condition of being "much more likely than not [to] reoffend at some point in the future, even while supervised." But, although Judge Franke opined that it "would be fundamentally unfair if unlawful confinement were to cause behavior which is then use[d] to justify lawful confinement," Judge Franke never found that non-compliance with the orders designed to place Schulpius in the

461

community on supervised release *caused* Schulpius to either be a "sexually violent person" or be unsuitable for supervised release. Rather, Judge Franke recognized that Schulpius's aggressive behavior toward Dr. Sachsenmaier within the facility (where, presumably, Schulpius would have been on his *best* behavior) was "relevant to the assessment of risk," as was Dr. Sachsenmaier's opinion, which Judge Franke referenced in the November 29 decision, that Schulpius "represents an extremely high risk for re-offense even while under the type of supervision posited by the court." (Emphasis by Judge Franke omitted.)

¶ 42. Moreover, although we recognize Judge Franke's justifiable irritation at the inability of the Department and Milwaukee County to comply with his orders, any judicial decision that puts the community at risk because of what agents of government may have done or not done must balance the "potential injury" to society's interests against the "potential benefits" that would flow from any rule designed to deter future conduct by those agents, even where—as is not the case here—those agents might have violated rules designed to protect constitutional rights. *United States v. Calandra*, 414 U.S. 338, 348–349 (1974) (*Mapp v. Ohio*, 367 U.S. 643 (1961), does not apply to grand jury proceedings because of society's greater need to let grand juries have the largely unfettered right to evidence); *see also State ex rel. Struzik v. Department of Health & Soc. Servs.*, 77 Wis. 2d 216, 223, 252 N.W.2d 660, 663 (1977) (statements taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), may be used at parole- or probation-revocation hearings); *State v. Lombard*, 2003 WI App 163, ¶¶ 26–27, 266 Wis. 2d 887, 904, 669 N.W.2d 157, 165–166 (statements made by a person committed under WIS. STAT. ch. 980 to an examining

psychologist may be used in ch. 980 proceedings even though the person was not given the warnings set out in *Miranda* so long as those statements could not incriminate the person " 'in a pending or subsequent criminal prosecution' ") (quoted source omitted), *review granted,* 2003 WI 140, 266 Wis. 2d 59, 671 N.W.2d 847; *State v. Jackson,* 229 Wis. 2d 328, 345, 600 N.W.2d 39, 47 (Ct. App. 1999) (statements made by a defendant whose rights under *County of Riverside v. McLaughlin,* 500 U.S. 44 (1991) (arrested suspect must have a probable-cause hearing within forty-eight hours of arrest), were violated, are not, for that reason alone, to be suppressed), *grant of habeas corpus rev'd on other grounds, Jackson v. Frank,* 348 F.3d 658 (7th Cir. 2003); *Harrah v. Leverette,* 271 S.E.2d 322, 333 (W. Va. 1980) (release of prisoners abused horribly by prison personnel a remedy of last resort). Applying the required balancing, it would make as little sense to release from confinement a dangerous sexual predator like Schulpius because the responsible government officers could not comply with Judge Franke's orders as it would to release into the community from quarantine someone whose dangerous contagion might have either been exacerbated or even caused by government personnel. Thus, recognition by *Kansas v. Hendricks,* 521 U.S. 346, 366 (1997), that treatability is not a constitutional prerequisite to the permanent civil confinement of the "dangerously insane" was based in part on the historical validity of quarantine laws affirmed in *Compagnie Francaise de Navigation a Vapeur v. Louisiana Bd. of Health,* 186 U.S. 380, 387 (1902).

¶ 43. Schulpius's danger to the community, at least so far, is similar to the dangers presented by those who, in the words of *Hendricks,* are "afflicted with an untreatable, highly contagious disease." *Hendricks,* 521

U.S. at 366. Releasing Schulpius into the community despite the substantial danger he presents would, as the phrase goes, turn the law on its head. In sum, application to Schulpius of WIS. STAT. ch. 980 did not deprive him of either substantive or procedural due process. Judge DiMotto appropriately denied Schulpius's motion to enforce Judge Franke's order directing that Schulpius be released "forthwith."

*By the Court.*—Order affirmed.

¶ 44. SCHUDSON, J. (*dissenting*).   For *more than four years,* from July 1996 to November 2000, the circuit court ordered Shawn Schulpius' supervised release. During those years, the court repeatedly reiterated its order and: (1) denied the State's motion for reconsideration; (2) concluded, given the State's assertion of its inability to follow the orders, that WIS. STAT. ch. 980 was unconstitutional as applied to Schulpius; (3) ordered his supervised release "forthwith;" and (4) found the Department of Health and Family Services in contempt. Still, the orders for Schulpius' supervised release were not followed.

¶ 45.   Thus, for *more than four years* before the court vacated the supervised release orders, Schulpius remained confined in violation of court orders. And, throughout that time—and even to the present, as indicated by the Assistant Attorney General at oral argument before this court—the State was and is unable to implement court orders for supervised release of sex predators in Milwaukee County.

¶ 46.   In short, WIS. STAT. ch. 980 is the law but, for some, it cannot be enforced. And when it cannot be enforced, individuals remain confined despite court orders to release them. Thus, if one accepts the underlying logic of ch. 980, these sex predators necessarily

receive services that are *in*appropriate or, at the very least, *less* appropriate than those the courts have found would provide the best treatment *and* community protection.

¶ 47.   Are *more than four years of unlawful confinement in violation of court orders* " 'shocking to the universal sense of justice' "? *See State v. Hyndman,* 170 Wis. 2d 198, 208–09, 488 N.W.2d 111 (Ct. App. 1992) (quoting *United States v. Russell,* 411 U.S. 423, 432 (1973)). Does such governmental misconduct "shock[ ] the conscience," *see Rochin v. California,* 342 U.S. 165, 172 (1952), and thus constitute a denial of substantive due process?

¶ 48.   The very questions seem sarcastic. Confining a person in violation of a court order, even for a day, is cause for concern. When unlawful confinement continues beyond a brief time, concern becomes constitutional cause, sometimes even triggering the "great writ" —*habeas corpus. See Seling v. Young,* 531 U.S. 250, 258 (2001). And that is so even when the unlawful confinement results from an innocent mistake, such as the misinterpretation of a sentencing order or the miscalculation of a release date. *See generally Preiser v. Rodriguez,* 411 U.S. 475, 484–86 (1973) (habeas corpus provides relief from illegal custody).

¶ 49.   But here, Schulpius' *more than four years* of unlawful confinement did not result from an innocent mistake or misinterpretation. Schulpius' unlawful confinement continued notwithstanding:   (1) the State's full understanding of the court orders for supervised release; and (2) the State's claimed inability to implement the orders.

¶ 50.   Such governmental conduct is unconscionable; it constitutes deliberate indifference as a matter of law, even absent bad faith by any individual official.

465

*See Johnson v. Herman*, 132 F. Supp. 2d 1130, 1140–41 (N.D. Ind. 2001) (The absence of procedure or policy where one is clearly needed, such as verifying the authority to confine a prisoner, gives rise to an inference of deliberate indifference and, where the resulting unlawful confinement could have continued "for months," the totality of the circumstances "shocks the conscience."); *Armstrong v. Squadrito*, 152 F.3d 564, 578–79 (7th Cir. 1998) ("In a constitutional sense, how much more basic could it get—jails cannot confine people without the authority to do so. A policy that ignores whether the jail has the authority for long-term confinement seems to be a policy of deliberate indifference."). Indeed, "[i]n a constitutional sense, how much more basic could it get?" *Armstrong*, 152 F.3d at 578.

¶ 51. For Schulpius and others who qualify for supervised release in Milwaukee County, Wis. Stat. ch. 980 has become an ugly charade. And this charade is performed on what many consider a dimly lit stage. Lest we forget, ch. 980 keeps people confined and/or supervised *after they have completed their sentences*. It is one of the relatively new laws reflecting the efforts of some states to control and treat sex predators *after they have fully paid their penalties*. Powerfully (and appropriately, I believe), these laws respond to the growing body of knowledge about sex offenders, particularly pedophiles, and their virtually certain danger to society long after their sentences have been served. Still, we must recognize that these laws, like none before, seem to say, "Do the crime, do the time, *and then do more time, indefinitely.*"

¶ 52. Understandably, therefore, sex predator commitment laws have raised serious due-process concerns and faced concerted constitutional challenges. *See* Majority at ¶ 34 (cases cited therein). Addressing those

challenges, courts have sought to balance the rights of sex predators who have completed their sentences and the rights of the communities they endanger.

¶ 53. Balancing the scales, the Wisconsin Supreme Court concluded that, precisely because WIS. STAT. ch. 980 included certain procedural and substantive safeguards, it was constitutional. *See generally State v. Carpenter*, 197 Wis. 2d 252, 541 N.W.2d 105 (1995). Reiterating that conclusion, however, our supreme court commented: "As with all enactments, we presume good faith on the part of the legislature. We conclude that treatment is a bona fide goal .of this statute and we presume the legislature will proceed in good faith and fund the treatment programs necessary for those committed under chapter 980." *State v. Post*, 197 Wis. 2d 279, 308 (1995) (citation omitted).

¶ 54. But betray that good faith . . . destroy those safeguards . . . and the statutory structure falls. *See id.* at 313 ("At a minimum, the Supreme Court has stated that 'due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.' ") (quoted source omitted); *see also State v. Sprosty*, 227 Wis. 2d 316, 330, 595 N.W.2d 692 (1999) ("Wisconsin's sexual predator law survived constitutional challenge, in part, because the nature and duration of ch. 980 commitments are to be reasonably related to the purposes for those commitments."). And even more recently, Justice Ann Walsh Bradley punctuated that very point.

¶ 55. In 2002, the supreme court rejected constitutional challenges to certain amendments to WIS. STAT. ch. 980 affecting a sex predator's opportunity for supervised release. *State v. Rachel*, 2002 WI 81, ¶¶ 1–2, 254 Wis. 2d 215, 647 N.W.2d 762. Concurring, Justice Bra-

dley recalled her majority opinion's comment in *Carpenter* that the constitutionality of ch. 980 derived, in part, from the understanding that the State would not " 'simply warehouse' " sex predators. *Rachel*, 254 Wis. 2d 215, ¶ 72 (Bradley, J., concurring) (quoted source omitted). Justice Bradley then noted that she had joined with the majority in *Post* in "assum[ing] that 'the legislature will proceed in good faith and fund the treatment programs necessary for those committed under chapter 980.' " *Id.*, ¶ 73 (quoted source omitted). She then wrote:

> In response to the skepticism expressed by the dissent as to whether supervised release is a viable option, the majority in this case once again relies on an assumption that the State will meet its statutory and constitutional obligations. The majority writes: "we think it is more appropriate that the agencies and individuals that are charged with monitoring the treatment progress of institutionalized sexually violent persons be given the benefit of the assumption that they will carry out their responsibilities as the legislature has directed."

> The court's assumptions and the State's good faith are wearing thin.

> We continue to gain experience with the way that ch. 980 has played out in the real world. Since *Carpenter* and *Post*, the case law has become rife with examples of the State's inability to provide appropriate placements for those committed under ch. 980.

*Id.*, ¶¶ 74–76 (citation omitted).

¶ 56. "[G]ood faith [was] wearing thin." *See id.*, ¶ 75. Now it is threadbare. If repeated violations of court orders resulting in *more than four years* of unlawful confinement cannot convince our courts to restore

the constitutional fabric, individual liberty will no longer be protected from the penetrating winds of governmental cynicism and neglect.

¶ 57. Clearly, Wɪs. Sᴛᴀᴛ. ch. 980, unenforceable in Schulpius' case, was unconstitutional as applied to him. His *more than four years* of unlawful confinement should "shock the conscience" of all who respect the rule of law and remain dedicated to both civil liberties *and* community protection. And if, as one would reasonably infer from this record and from oral argument, supervised release of predators in Milwaukee County remains nothing more than a charade, the judiciary must respond with speed, wisdom and power.[1]

¶ 58. While to some it may seem poetically just that Schulpius, having unconscionably victimized others, has himself been victimized by unconscionable conduct, Wɪs. Sᴛᴀᴛ. ch. 980 provides for no such *ad hoc* retribution. Where government's unconscionable conduct denies due process of law, courts must fashion appropriate remedies. *See Epstein v. Benson*, 2000 WI App 195, ¶ 49, 238 Wis. 2d 717, 618 N.W.2d 224.

¶ 59. So now, what about Schulpius? Years after he was to have been released, he finally was found to be inappropriate for supervised release. The circuit court, noting the irony, commented, "It would be fundamentally unfair if unlawful confinement were to cause behavior which is then used to justify lawful confinement." Still, the fact remains that Schulpius, by the

---

[1] The Majority notes that the United States Supreme Court has explained that predator commitments may continue, even without treatment, for those who are not treatable. *See Kansas v. Hendricks*, 521 U.S. 346, 366 (1997); *see also Seling v. Young*, 531 U.S. 250, 262 (2001). But no such case is before us. Schulpius was treatable and received treatment, and the court concluded he was appropriate for supervised release.

time of the final operative order, was no longer appropriate for release. So what is the remedy?

¶ 60.   At oral argument, Schulpius' counsel maintained that outright release was the only proper remedy to protect Schulpius' rights and deter the government's violations of court orders. The Assistant Attorney General disagreed. He suggested other remedies—perhaps an award of monetary damages; perhaps financial penalties for officials or departments responsible for failing to follow the court orders; perhaps, if no supervised-release facility in Milwaukee County exists, court direction of expenditures to create one. Or at most, the Assistant Attorney General urged, if Schulpius must be released, he should be supervised.

¶ 61.   Interestingly enough, in the most fundamental way, the parties' positions are not far apart. Both Schulpius and the State seek compliance with court orders; both want enforcement of the law the legislature enacted, not a charade. But can any remedy give Schulpius his due, prevent such Kafkaesque confinement of others, and, at the same time, protect the community? I believe so; but to understand how, one must think through each of the several options.

¶ 62.   Damages? That's silly; Schulpius' new-found wealth would be of little benefit behind bars, and the status quo would continue. Financial penalties for government officials or departments? That's spittin' into the wind; the government could continue to violate court orders and, ultimately, the penalties would pass on to the taxpayers. Continued confinement with, again, the *false* promise of possible supervised release? What could more certainly *reduce* incentives for confined predators to cooperate in treatment?

¶ 63.   And where would such remedies lead? Just play them out—any one of them. *Any remedy short of*

470

*supervised release actually endangers our community more than release itself.* The status quo would continue. The State, rather than creating a Milwaukee County facility to house, treat and supervise predators, would keep Schulpius and other predators confined even when courts ordered their supervised release. Wisconsin then would need to increase staff and eventually build institutions to make room for all the unlawfully confined predators who qualify for the supervised release that will never come.

¶ 64.    Then what would happen? What, in all likelihood, would Wisconsin really do? Now swallow hard; here's the last bite of Kake-Kafkaesque. Faced with tight budgets and overcrowded institutions, Wisconsin could solve this fiscal and constitutional riddle in only one way: by no longer seeking commitment of sex predators in Milwaukee County (and, eventually, in other counties claiming to be unable to provide suitable facilities). Thus, quite certainly, judicial acquiescence in this governmental misconduct leaves not only a constitutional stain, but a *more endangered community.*

¶ 65.    So we come full circle; once again, if we embrace our judicial responsibility, we see how the law-breaker becomes the law-enforcer. Schulpius, an unconscionable sex predator, has met unconscionable governmental conduct and, in the process, emerged as the rare individual who can force *the government* to obey the law—for the good of all. As one of the attorneys who had represented Clarence Earl Gideon wrote many years ago:

> It has become almost axiomatic that the great rights which are secured for all of us by the Bill of Rights are constantly tested and retested in the courts by the people who live in the bottom of society's barrel. Thus, many of our freedom-of-religion cases developed

471

out of efforts by members of small sects to force religious tracts upon people who did not want them; our freedom-of-speech cases have developed from the efforts of the police to jail persons who ranted and raved against others, including Catholics, Jews and Negroes . . . .

In the future the name "Gideon" will stand for the great principle that the poor are entitled to the same type of justice as are those who are able to afford counsel. It is probably a good thing that it is immaterial and unimportant that Gideon is something of a "nut," that his maniacal distrust and suspicion lead him to the very borders of insanity. Upon the shoulders of such persons are our great rights carried.

ANTHONY LEWIS, GIDEON'S TRUMPET 227–28 (Vintage Books 1964).

¶ 66.   If we see Schulpius only as a sex predator, we warehouse him without regret. But if we recognize the constitutional rights Schulpius carries, we respond with the remedy as we must. And by completing the several possible remedy-scenarios, we see the results of judicial acquiescence in unconscionable governmental conduct: in the short run, Milwaukee County remains safe from Schulpius, but in the long run, Milwaukee County, along with the rest of Wisconsin, becomes *more endangered by more sex predators* whom the State should but won't commit.

¶ 67.   Therefore, I accept the Assistant Attorney General's last option as, truly, the only option. Only immediate *supervised* release can address the *more*

*than four years* of violations of court orders and, at the same time, offer the best possible community protection.[2]

---

[2] Moreover, courts must remember that they do indeed have inherent authority to command resources to implement their orders, and contempt authority to enforce them.

Almost a century ago, the Wisconsin Supreme Court emphasized that a court "has inherent power to protect itself against any action that would unreasonably curtail its powers or materially impair its efficiency." *In re Court Room*, 148 Wis. 109, 121, 134 N.W. 490 (1912). Sixteen years later, our supreme court declared: "From time immemorial, certain powers have been conceded to courts because they are courts. Such powers have been conceded because without them they could neither maintain their dignity, transact their business, nor accomplish the purposes of their existence." *State v. Cannon*, 196 Wis. 534, 536, 221 N.W. 603 (1928); *see also In re Kading*, 74 Wis. 2d 405, 411, 246 N.W.2d 903 (1976) ("contempt power . . . [may also be] used in . . . situations in which judicial authority has been . . . ignored").

"Once jurisdiction has been granted to a court, it must have the requisite power to enforce its orders. Indeed, it is the court's duty to insure that its orders are obeyed by invoking the appropriate remedial sanctions." *D.L.D. v. Circuit Court for Crawford County*, 110 Wis. 2d 168, 181, 327 N.W.2d 682 (1983). And those remedial sanctions may be sweeping and costly. *See Seling v. Young*, 531 U.S. at 266 (State of Washington's Special Commitment Center for sex predators, "assisted" by a "Special Master," "operates under an injunction that requires it to adopt and implement a plan for training and hiring competent sex offender therapists; to improve relations between residents and treatment providers; to implement a treatment program for residents containing elements required by prevailing professional standards; to develop individual treatment programs; and to provide a psychologist or psychiatrist expert in the diagnosis and treatment of sex offenders to supervise the staff.").

¶ 68. Finally, lest this opinion be misconstrued, I am anything but hostile to legislative efforts to commit sex predators. Notwithstanding the compelling arguments against them, the sex predator commitment laws, properly drawn and applied, are constitutional and, I believe, essential to the protection of the community. I have authored and/or joined in the majority of several opinions rejecting challenges to WIS. STAT. ch. 980 commitments. *See State v. Parrish*, 2002 WI App 263, 258 Wis. 2d 521, 654 N.W.2d 273, *review denied,* 2003 WI 16, 259 Wis. 2d 101, 657 N.W.2d 706; *State v. Brown*, 2002 WI App 260, 258 Wis. 2d 237, 655 N.W.2d 157, *review denied,* 2003 WI 1, 258 Wis. 2d 107, 655 N.W.2d 127; *State v. Treadway*, 2002 WI App 195, 257 Wis. 2d 467, 651 N.W.2d 334, *review denied,* 2002 WI 121, 257 Wis. 2d 116, 653 N.W.2d 889; *State v. Pletz*, 2002 WI App 221, 239 Wis. 2d 49, 619 N.W.2d 97; *State v. Pharm*, 2000 WI App 167, 238 Wis. 2d 97, 617 N.W.2d 163; *State v. Adams*, 223 Wis. 2d 60, 588 N.W.2d 336 (Ct. App. 1998). And having developed some expertise in this and related fields, I also have been deeply involved in professional educational efforts to help judges better understand and respond to child sexual abuse. *See* BILLY WRIGHT DZIECH & CHARLES B. SCHUDSON, ON TRIAL: AMERICA'S COURTS AND THEIR TREATMENT OF SEXUALLY ABUSED CHILDREN (2d ed. 1991).

¶ 69. Thus, I need no convincing that sex predators endanger our communities in extraordinary ways and, therefore, that their control requires extraordinary measures. But those measures must be constitutional. *See Kansas v. Hendricks*, 521 U.S. 346, 356–58 (1997). A sex predator commitment law that, in the

most fundamental way, *cannot function as written* cannot stand. *See generally id.*[3]

<hr>

[3] As Judge Franke commented: "[A]t a minimum, the Department must arrange for the very elementary and reasonable programs of supervision and treatment which will enable such respondents to reside in the community. If such efforts are not required, the clear statutory command becomes an empty ringing of words."

In a related sense, this case presents the circumstances that, had they been present in *Seling*, would have welded the concurring opinion of Justice Thomas to that of the majority, which commented:

> Justice Thomas, concurring in the judgment, takes issue with our view that the question before the Court concerns an as-applied challenge to a civil Act. He first contends that respondent's challenge is not a true "as-applied" challenge because respondent does not claim that the statute " 'by its own terms' is unconstitutional as applied . . . but rather that *the statute is not being applied according to its terms at all.*" We respectfully disagree. The Act requires "adequate care and individualized treatment," but the Act is silent with respect to the confinement conditions required at the [State of Washington Special Commitment] Center, and that is the source of many of [the] respondent's complaints.

*Id.*, 531 U.S. at 264 (emphasis added) (citations omitted). Here, by contrast, Schulpius is not presenting an "as-applied" challenge based on the conditions of treatment. Rather, he is protesting that WIS. STAT. ch. 980 "is not being applied according to its terms at all." *See id.* For more than four years, the circuit court agreed.

Accordingly, regardless of whether, consistent with *Seling*, Schulpius could ever pursue a double-jeopardy or *ex post facto* "as-applied" challenge, he has properly presented a substantive due-process challenge. Therefore, whether termed an "as-applied" challenge or, as Justice Thomas might rightfully prefer, a "not . . . applied-according-to-its-terms-at-all" challenge, is of little consequence.

¶ 70. To repeat: *a sex predator commitment law that, in the most fundamental way, cannot function as written cannot stand.* This proposition, I trust, is so clear that, I fear, I belabor what should simply be known, without words. And yet, finding that my voice is crying out alone, I persist.

¶ 71. Thus I struggle to state the obvious: if the constitutionality of WIS. STAT. ch. 980 depends on the substantive rights it declares, the unconscionable removal of those rights destroys its constitutionality. I search for metaphors—without strings, a Stradivarius is silent . . . without wings, an eagle dies.

¶ 72. Thus, while appreciating the meticulous manner in which the Majority has traced the history of this case, and while finding little fault with the Majority's articulation of certain legal principles, I see a very different drama. The Majority, perhaps distracted by an ugly charade, has failed to perceive the classic tragedy Schulpius and the State have performed on our constitutional stage.

¶ 73. Accordingly, I respectfully dissent.